The **CALIFORNIA OREGON POWER COMPANY**, a Corporation, Petitioner,

v.

**FEDERAL POWER COMMISSION,** Respondent, The State of Oregon, Intervenor. Nos. 12235 and 12236.

United States Court of Appeals District of Columbia Circuit. Argued Dec. 1, 1954.

Remanded to Commission April 14, 1955, for clarification of orders.

Resubmitted April 28, 1956, on further findings of the Commission. Decided Oct. 25, 1956.

Mr. Malcolm T. Dungan, San Francisco, Cal., with whom Mr. Gregory A. Harrison, San Francisco, Cal., was on the brief, for petitioner. Mr. C. Frank Reifsnyder, Washington, D. C., also entered an appearance for petitioner.

Messrs. Willard W. Gatchell, Gen. Counsel, Federal Power Commission, and John C. Mason, Atty., Federal Power Commission, with whom Messrs. Joseph B. Hobbs and Louis C. Kaplan, Attys., Federal Power Commission, were on the brief, for respondent. Mr. Joseph E. Hayden, Atty., Federal Power Commission, also entered an appearance for respondent.

Mr. Robert Y. Thornton, Salem, Or., entered an appearance for intervenor.

Before WILBUR K. MILLER, BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

The California Oregon Power Company (Copco) petitions for review of two orders of the Federal Power Commission, one of which licenses Copco to build a new project called "Big Bend No. 2" and the other of which requires it to file applications for licenses for five existing projects on the Klamath River and Link River.

Section 4(e) of the Federal Power Act, 49 Stat. 840 (1935), 16 U.S.C.A. § 797(e), gives the Federal Power Commission jurisdiction to license power projects in three situations: those constructed in navigable waters of the United States, those constructed on public lands of the United States, and those

constructed "for the purpose of utilizing the surplus water or water power from any Government dam".[1] The jurisdictional bases upon which the Commission issued its two orders were "(1) that the proposed Big Bend No. 2 project would be located in navigable waters of the United States and the five existing plants are located in such waters; (2) that the proposed project would occupy lands of the United States; and (3) that the proposed project would utilize, and the five existing plants now utilize, surplus water from a Government dam." (Gov.Br., pp. 1–2.) Petitioner contests, as a matter of law, the findings as to use of surplus water. Whether this court should review those findings is the initial problem in the case.

## I.

The background facts must first be stated. The dam involved is the Link River Dam, which was built by Copco pursuant to an agreement with the Department of the Interior entered into in 1917.[2] Under this agreement Copco built Link River Dam at the outlet of Upper Klamath Lake for the purpose of controlling and regulating the waters of the lake and the flow into Link River (which subsequently becomes the Klamath River), and agreed to convey title to the dam to the United States and to maintain water levels between certain prescribed points so as to provide water for irrigation purposes on a year-round basis. In return, Copco was permitted to maintain and operate the Dam for a 50-year period expiring in 1967 and to use all water not needed for irrigation purposes. The Government's role in regard to irrigation in the Klamath area is based on the Reclamation Act of 1902, 32 Stat. 388, as amended, 43 U.S.C.A. § 371 et seq., and authorizing legislation of the State of Oregon enacted in 1905, Laws 1905, c. 5. The original contract provides, specifically, that at the end of the 50-year period of Copco's control and operation of the Dam, all its rights thereunder shall terminate.

At no time has there been a power plant at the Link River Dam itself, and none is here proposed. Two of Copco's existing plants are located a mile below the Dam, and another is 20 miles downstream from it. Copco's new project (Big Bend No. 2) is to be located 32 miles downstream from the Dam. The two other existing plants are 57 and 59 miles downstream from the Dam.

In April, 1951, Copco applied for a license for Big Bend No. 2 development on the Klamath River in Oregon, which was designated as Project No. 2082. Thereafter in November, 1951, the Commission issued a show cause order, Docket No. E–6390. In reliance on a report of the Corps of Engineers that "Power developments, if properly regulated, might benefit the light draft navigation in the lower river," and on the basis of the license application filed for Project No. 2082, the order directed the company to show cause why it should not file separate applications for licenses for its existing developments on the Klamath River. Copco's answer, *inter alia*, denied

1. Section 4(e) provides, in pertinent part, that licenses may be issued—

 " * * * for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works * * * for the purpose of utilizing the surplus water or water power from any Government dam * * *."

 Section 23(b) of the Act, 49 Stat. 846 (1935), 16 U.S.C.A. § 817, provides, in part:

 "It shall be unlawful for any person, state, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States * * * or utilize the surplus water or water power from any Government dam, except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this Act."

2. It was amended subsequently in certain particulars not relevant here, and was extended for a further term, as will be later explained.

that its projects were utilizing surplus water. On October 2, 1953, the presiding examiner issued his proposed decision on the application for Project No. 2082, and there suggested that the present contract between Copco and the Department of the Interior should be extended for the full period of the proposed Power Commission license for the project, which would run approximately to the year 2006. The opinion of the Power Commission relating both to the proposed and existing projects was issued thereafter on January 28, 1954, with one Commissioner concurring in the result only. The Commission found that Project No. 2082 would occupy navigable waters and land of the United States and would utilize surplus water from a Government dam. Jurisdiction for licensing the five existing projects was found by reason of the occupancy of navigable waters and use of surplus water from a Government dam.[3]

By order dated January 28, 1954, a license for Project No. 2082 was issued, subject to acceptance by Copco. In paragraph 17 of the order petitioner was granted a license under Section 4(e) of the Federal Power Act, 16 U.S.C.A. § 797(e), for a period of 50 years, and was required to file as a condition of the license a copy of the 1917 agreement with the Department of the Interior, with an amendment covering the 50-year license period on terms similar to those of the original agreement. Under paragraph 17(B) of its order the Commission further directed that the standard conditions governing licenses for unconstructed major projects affecting navigable waters and lands of the United States should have application to Project No. 2082, and that certain additions should be made to these terms. One of these additions was Article 35, providing for annual charges as follows: (a) for reimbursement to the United States of the

cost of administration of the Federal Power Act under Part I thereof, 16 U.S. C.A. § 791a et seq., (b) for the use and occupancy of lands belonging to the United States, (c) for the right-of-way of the transmission line, (d) for the purpose of recompensing the United States for the "use, occupancy and enjoyment of Link Dam."

With regard to the amount of the annual charge for item (d), the Commission found that the obligations undertaken by Copco under the 1917 agreement, as extended, would constitute reasonable compensation to the United States. On January 28, 1954, the Commission also issued its order requiring Copco to file applications for its five existing projects.

Thereafter the petitioner filed an application under Section 313(a) of the Federal Power Act, 16 U.S.C.A. § 825*l* (a), for rehearing and modification of the Commission's opinion and orders, alleging *inter alia* that the Commission erred when it held that the projects will use surplus water from a Government dam and that the Commission was compelled to assert its jurisdiction on this ground. Rehearing was denied by the Commission's order of March 29, 1954. Thereafter Copco filed its petition for review in this court, requesting deletion, from the order licensing Big Bend No. 2 and the order requiring it to file applications for licenses for the existing projects, of any reference to the utilization of surplus water from a Government dam as a basis for jurisdiction and the requiring of the payment of annual charges by reason thereof.

The basic contention of the petitioner is that the jurisdictional basis of use of surplus water "from" a Government dam means "use of surplus water *at* a Government dam," and not downstream from it. The Commission urges a literal in-

---

**3.** The Commission's opinion noted that the Department of the Interior had originally opposed the license application for Project No. 2082 but now was willing to agree to it, provided that Copco be required to enter into an extension agreement of the 1917 contract prior to the grant of the license.

terpretation of the statutory language. When the matter was argued before us, we had serious doubt whether decision of the question was necessary or proper in the present posture of the case, it being clearly apparent that the Commission had jurisdiction here on other than surplus water grounds. Under the circumstances, we decided to remand the case to the Commission for clarification of its orders and the jurisdictional basis therefor. The remand was directed by our order of April 14, 1955.

The Commission, on February 23, 1956, adopted a supplemental opinion and order, amending and clarifying its prior orders. Among other things, the new order recognized an agreement entered into between Copco and the Secretary of the Interior under date of January 31, 1956 (the new Link Dam Agreement), and found that the annual benefits to be received by the United States thereunder constitute reasonable compensation for the use of Link Dam. The new order also amended Article 35(d) of the order previously entered regarding the Big Bend No. 2 project, in a manner to be described later on in the present opinion. The Commission's supplemental opinion reaffirmed its position that jurisdiction existed in the Commission under the "surplus water" clause. On April 28, 1956, Copco filed with this court a further statement of its views, contesting the Commission's assertion of such jurisdiction.

Throughout the entire sequence of events the Commission has not only claimed that jurisdiction can be asserted on the basis of Copco's claimed use of surplus water, but, in addition, that jurisdiction on this ground "must be asserted by the Commission, for under the provisions of Section 10(e) of the Federal Power Act this Commission has the responsibility of fixing reasonable annual charges for the use of a Government dam." (Commission opinion of January 28, 1954.) Both Copco and the Commission urge that the assertion of jurisdiction on this ground presents a reviewable question. Both say that the question is vital to the disposition of the present case, has great practical importance in other situations, and should be decided by this court.

## II.

On these facts, do we have before us a justiciable controversy, ripe for judicial review? We think not.

■ In the first place, everything the Commission has so far done—except for the mere unimplemented assertion of its jurisdiction on the basis of a claimed use of "surplus water"—can be accomplished by reliance on its admitted jurisdiction over navigable waters and, also, in the case of Big Bend No. 2, on its jurisdiction over Government lands. See United States v. Appalachian Electric Power Co., 1940, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243. The abstract assertion of jurisdiction by an agency is not ordinarily a basis for judicial review. See American Air Export & Import Co. v. O'Neill, 1954, 95 U.S.App.D.C. 274, 221 F.2d 829.

But petitioner urges that the assertion of jurisdiction on the basis of a claimed use of surplus water imposes upon it the obligations of Section 10(e), and it contends that one of these obligations is payment for the use of surplus water. In this regard, it points to Article 35(d) of the Commission's order licensing the new project (Big Bend No. 2). The condition (as amended) reads:

Article 35(d). "For the purpose of recompensing the United States for the use, occupancy, and enjoyment of Link Dam, (1) the annual benefits set forth in the 1917 Link Dam agreement, as amended, are reasonable and adequate during the term of that agreement; and (2) the annual benefits set forth in the new Link Dam agreement dated January 31, 1956, are reasonable and adequate commencing with the date on which the new Link Dam agree-

ment supersedes the 1917 agreement." [4]

Petitioner appears to interpret this provision as permitting separate charges for use of a Government dam and use of surplus water. It contends that Article 35(d) covers only the charge *for use of the dam,* leaving the Federal Power Commission free to charge for use of surplus water (Pet.Mem. pp. 8, 14), apparently under the clause of Section 10(e) authorizing a charge for use of *other property* of the United States.[5] However, the Commission has at no time contended that surplus water is "other property" of the United States, within the meaning of Section 10(e), for which a charge may be imposed. In the Commission's opinion accompanying its orders, it said the charges contemplated by the assertion of jurisdiction on the basis of use of surplus water were "reasonable annual charges for the use of a Government dam." From this it would seem that the Commission considers use of surplus water from a Government dam to be one of the uses that can be made of a Government dam.[6] And in the Commission's view Article 35(d) is the only part of the order that imposes a charge for use of a Government dam. But by its terms Article 35(d) imposes no new charge for the use of Link Dam, other than those already in effect under the terms of the new Link Dam agreement. Petitioner concedes that the Commission's decision to let the benefits of this agreement suffice as adequate consideration for the use of Link Dam presents no reviewable question. But it does

urge that the Commission's power to readjust charges places Copco in the position of assuming an obligation with only the amount of payment to be set. We cannot agree. As the Commission's supplemental opinion recognizes, its power to readjust charges for use of a Government dam is not unfettered. That opinion says: "[I]t appears that the Commission may not fix 'additional' charges at this [the present] time since the annual benefits to the United States under the 1917 agreement and under the new Link Dam agreement constitute reasonable annual charges under present conditions. However, in the event such charges become unreasonable they may be readjusted from time to time as provided by Section 10(e) of the Act." Section 10(e) provides for readjustment of charges "at the end of twenty years after the project is available for service and at periods of not less than ten years thereafter". Thus the only "obligation" imposed upon Copco by Article 35(d) is to pay for use of a Government dam after twenty years *if* the present charge becomes unreasonable, and then (it would seem) only *if* the Commission prepares an adequate record showing what surplus water is, how much is being used, and what charge is to be imposed.

Nothing in the Commission's present opinion or findings would serve as a basis for a present or imminent charge for the use of surplus water, nor as a basis for the other prospective agency actions in which petitioner contends the Commission's "surplus water" theory may be determinative.[7] The Commission

---

4. The new Link Dam agreement, dated January 31, 1956, extends the term of the 1917 contract from 1967 to 2006.

5. Section 10(e) provides, inter alia, "That the licensee shall pay to the United States reasonable annual charges * * * for the use, occupancy, and enjoyment of its [the United States'] lands or other property * * *."

6. Whether this construction of Section 10 (e) is proper we need not at this time determine. As the construction for which the Commission contends presents

no reviewable question, we need not speculate as to what other constructions might present such a question.

7. In addition to readjusted charges petitioner mentions proceedings under Section 4(b) of the Act to determine the cost of and investments in the projects, questions concerning the amounts which should be debited to surplus and credited to amortization reserves under Section 10(d), and a question under Section 14 as to whether the flow of water rights should be included in the amount to be paid to the licensee.

has not ruled with clarity on what it considers "surplus water" to be, or in any event what amount of it will be used by Copco, or when (if ever) Copco is to be charged for it, or at what rate. Copco says that the Commission defines surplus water as "any water passing over a reclamation dam in excess of irrigation requirements." (Pet.Br. p. 7.) This would equal all the water that flows over the Link Dam in excess of the water needed for irrigation purposes. Probably the most clearly stated Commission definition is contained in the Commission's original opinion: "Where there is available *stored* water not to be used in irrigation, which represents storage over and above that needed for irrigation, and which would otherwise flow *unused* down the main channel of the stream, that water is 'surplus', and, *if used* for power development, would require a license from this Commission." (Emphasis supplied.) Presumably this definition operates as follows: Take the figures which show (in each month) how much the level of the lake behind the dam rises. This amount is stored water. Subtract the amount needed for irrigation. Then from this total, keep only those amounts of water which if released as unregulated stream flow (i. e., without a dam) would be *in excess of* the capacity of downstream plants and consequently wasted. This amount is surplus water. Then in those months when the unregulated stream flow would be *less than* the plant's capacity, this surplus water is being used. But an inspection of tables C–1, 2, 3, 4, and D–1, 2, in the Commission's brief, will show that even counsel for the Commission is uncertain that this definition is correct. The C tables show computations based on three assumptions. Then the D tables are prepared because, as the Commission's counsel admits, "there is testimony in the record that surplus water may be taken to mean" something else. Indeed the testimony (Gov.Br. pp. 13–14) gives several ideas as to what is surplus water.

The record is, in fact; in such a state that we could hardly hold (if we reached the question) that Copco has been shown to be a user of surplus water, on any theory. The Commission has not found whether or not water accumulated behind the Link Dam and thereafter released and used for power purposes retains identity as such in the flow of the stream below the dam. It may well be that such water ceases to be surplus water once it has passed the Government dam. See Green Bay & M. Canal Co. v. Patten Paper Co., 1898, 172 U.S. 58, 19 S.Ct. 97, 43 L.Ed. 364; Id., 1899, 173 U.S. 179, at page 190, 19 S.Ct. 316, 43 L.Ed. 658. Or it may be that such water retains its identity as surplus water in the general stream flow until additional water has been added to the stream either through springs in the river bed or through the accumulation of water from its tributaries. Though we express no opinion as to what surplus water is or what criteria are needed to measure it, we merely point out that problems such as those mentioned here are not adequately discussed either in the Commission's opinion or in its briefs before this Court. Copco need fear no consequence based on its alleged use of surplus water until the nature of whatever action the Commission may intend is specified and an adequate record is presented to support such action.

The decision in Rochester Tel. Corp. v. United States, 1939, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147, is not authority here for review of the Commission's order. In that case, the distinction between affirmative and negative orders was specifically rejected. But the Court's criticism of these terms relates only to their use as descriptive of orders. The decision still requires that the agency action have some positive effect on the complainant. True, a negative order may preserve the status quo and leave the complainant obligated to do certain things: this would be reviewable. What is decisive is not the form of the order, but rather the realities of the situation which the order creates (or continues) for the complainant. Thus, in Rochester the order "immediately carried direction

of obedience to previously formulated mandatory orders", 307 U.S. at page 144, 59 S.Ct. at page 764, and Rochester was thereby placed under an obligation to do specific things.

In Eccles v. Peoples Bank, 1948, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784, the Court applied the same approach. This case involved a request for a declaratory judgment, not a review of an order as such. Nevertheless it would seem that the criteria for review of orders and for granting declarations are similar. Says the Court: "The actuality of the plaintiff's need for a declaration of his rights is therefore of decisive importance." Id., 333 U.S. at page 432, 68 S.Ct. at page 644. And in denying relief, after pointing out the contingency which bars finality, it says, "The concurrence of these contingent events, *necessary for injury to be realized*, is too speculative to warrant anticipatory judicial determinations." Id., 333 U.S. at page 432, 68 S.Ct. at page 645. (Emphasis added.) And as this court recently observed in Isbrandtsen v. United States, 1954, 93 U.S.App.D.C. 293, 211 F.2d 51, 55, finality depends on "a realistic appraisal of the consequences" of the agency action. Even Columbia Broadcasting System v. United States, 1942, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563, perhaps the most "pro-reviewability" case, concerns itself with the fact that as a result of agency action (an announcement that license renewals would be turned down if licensees made certain contracts with networks) the complainant was already experiencing damaging effects through cancellation of contracts.

█ In all cases held reviewable, something was happening to the com-

plainant. Either someone was doing something to him or he was placed under an obligation to do something. Petitioner here contends that simply being placed under an obligation is sufficient. But an obligation that does not require anything to be done is surely not entitled to our review.[8] A "court is given no authority to review a mere finding upon which no order is based". Carolina Aluminum Co. v. Federal Power Commission, 4 Cir., 1938, 97 F.2d 435, 436.[9] Here there is not merely the lack of any order to pay something, there is in fact an order to pay nothing, until the Commission decides otherwise. This formal distinction hardly warrants review. Certainly it does not provide a circumstance that adds to injury or threat of injury. Petitioner here will not—apparently—be charged for use of surplus water for twenty years. At that time a charge may perhaps be imposed. There is no ruling that it will be. For the immediate future, certainly, the imposition of an additional charge would be quite contrary to the spirit—if not the letter—of the Commission's approval of the 1956 renewal of the Link Dam agreement.

█ It is true that in United States v. Appalachian Electric Power Co., supra, the Court did review a condition of a license based on Section 14 (the recapture provision). But in doing so the Court said: "We conclude that here the requirements of section 14 *so vitally affect the establishment and financing* of respondent's project as to require a determination of their validity * * *." At page 421 of 311 U.S., at page 306 of 61 S.Ct., emphasis supplied. Does the threat of recapture in 50 years have a

---

8. We do not suggest that a finding which renders one liable to a statutory obligation may not in some circumstances be reviewable. Cf. Rochester Tel. Corp. v. United States, supra. But the statutory obligations of Section 10(e) are not self-executing and require agency implementation.

9. And see Metropolitan Edison Co. v. Federal Power Commission, 3 Cir., 1948, 169 F.2d 719, 725, where an FPC opinion accompanying an order contained a finding that petitioner had been "in trespass" in maintaining its plant without a license. The court declined to review the finding. "The Commission's statement, however, is not germane to any *substantial issue* presented for our determination. * * * The Commission has not attempted to impose any penalty on Metropolitan by reason of the facts last mentioned."

more real effect on a licensee than the possible imposition of a charge in 20 years? We think the answer is that it does. Certainly compared to the situation in Peoples Bank, the situation here is far more speculative. There the Federal Reserve said it would expel a bank from membership if a contingency occurred, and the event later happened. But the Court refused to review the agency's threat. Here the agency may decide to impose a charge in 20 years if the present charge becomes unreasonable.[10] Thus here the contingency has not yet occurred upon which the agency considers that it can act.

The Commission further urges that Section 23(b) makes it unlawful for Copco "to operate its developments without a license authorizing their utilization of surplus water from Link Dam," (Supp.Op. p. 12), citing Montana Power Co. v. Federal Power Commission, 1950, 87 U.S.App.D.C. 316, 185 F.2d 491, 496, and United States v. State of Arizona, 1935, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371. Hence, it says, it must assert jurisdiction under the "surplus water" clause of the Act. We think the argument is circular and adds nothing in the present context: it does not justify us in finding a justiciable controversy when none otherwise exists. Furthermore, Section 23(b) does not require a license "authorizing utilization of surplus water" but simply a "license granted pursuant to this Act." Petitioner does not contest the necessity of securing licenses for its existing projects, and, as we have pointed out, no term of the license granted for the proposed project imposes or threatens any consequence based on the use of surplus water.

### III.

It follows from this reasoning that a justiciable controversy *can* arise in the future if and when the Commission actually does impose additional charges of the sort here in question. Copco can then contest in the courts the Commission's ruling as to the nature and amount of such charges, as well as the jurisdictional basis on which the Commission asserts the right to do so, i. e., that the petitioner uses surplus water from a Government dam. The mere passage of time between the old and new orders would not estop or preclude such judicial review. As we said in Peoples Bank v. Eccles, 1947, 82 U.S.App.D.C. 126, 134, 161 F.2d 636, 644, "No administrative body has authority to contract with a regulated corporation in a manner contrary to the statute which is being administered, nor in a way which does not give effect to the intent of Congress. The regulated corporation, by accepting such an invalid condition imposed by a regulatory authority, does not thereby waive the right to rely on the statute, and the right later to denounce the provision which contravenes it." The same principle was applied by this court in Standard Airlines v. Civil Aeronautics Board, 1949, 85 U.S.App.D.C. 29, 177 F.2d 18.[11]

---

10. This reflects our understanding of the Commission's position. We do not now pass, of course, on whether any charge—before or after the 20 year deadline—may be imposed under the terms of the license issued for Big Bend No. 2. Nor do we express any opinion as to the validity of any conditions that the Commission may include when it issues licenses for the existing projects.

11. The only case cited by the parties as throwing doubt on the position taken by this court is Louisville Gas & Electric Co. v. Federal Power Commission, 6 Cir., 1942, 129 F.2d 126. But in that case the contested condition was effective against the petitioner immediately. It involved the application of certain accounting principles and affected the accounts of the petitioner from the moment that the license was accepted and the Commission's accounting rules became applicable to the Gas Company. Under these circumstances it would seem to be proper to hold that the Gas Company should have contested the particular application of the accounting rules immediately and should not have waited until its violation was discovered and additional orders issued directing it to adjust its books in compliance with the basic rules.

In the Peoples Bank case, cited above, this court held that a particular condition imposed by the Federal Reserve System on a member bank was invalid and that the bank had the right to sue for declaratory relief, declaring the condition to have only a very limited scope, although it initially had not contested its imposition in the courts. Distinguishing cases where a party in accepting a Government license was held not entitled to challenge the constitutionality of the basic statute, this court said that this principle obviously "does not apply where the litigant charges that the administrative body has exceeded the authority conferred upon it by a statute, but does not attack the validity of the statute. Whether estoppel has arisen, whether waiver has occurred, depends entirely upon whether * * * [the condition] is valid or invalid." 82 U.S.App.D.C. at page 134, 161 F.2d at page 644. The decision of this court in the Peoples Bank case was reversed by the United States Supreme Court. Eccles v. Peoples Bank, 1948, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784. That Court, however, found it unnecessary even to reach the waiver or estoppel contention since it concluded that the bank's action in seeking declaratory relief was altogether premature.

 It is argued by petitioner that the case of Fahey v. Mallonee, 1947, 332 U.S. 245, 255–256, 67 S.Ct. 1552, 91 L.Ed. 2030, throws doubt on the doctrine of this court barring estoppel or waiver under the circumstances indicated. However, the holding in that case is narrow and appears to be limited to the point directly involved. Read in this light the case holds only that where a corporation has been created by a statute it has no right to contest the constitutionality of the statute insofar as it provides for proceedings terminating the corporate existence and winding up corporate affairs on the ground of insolvency, mismanagement or the like. The case is thus limited to a challenge of the constitutionality of the basic statute, and a challenge of the statutory power to terminate a corporation created by statute, where the grant of corporate existence tendered by the statute has been accepted. Neither of these situations is present in the instant case. Fahey v. Mallonee is therefore subject to the same distinction as the Pierce Oil [Pierce Oil Corporation v. Phoenix Refining Co., 259 U.S. 125, 42 S.Ct. 440, 66 L.Ed. 855] and other cases dealt with in this court's opinion in Peoples Bank v. Eccles, supra. See also United States v. Appalachian Electric Power Co., 4 Cir., 1939, 107 F.2d 769, 791, reversed on other grounds, 1940, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243.

The petitions for review will accordingly be dismissed, without prejudice to such steps as petitioner may be entitled to take, consistent with this opinion, in the event a justiciable controversy with the Commission later arises.

So ordered.