**PORTLAND GENERAL ELECTRIC COMPANY and Publishers' Paper Company, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**CROWN ZELLERBACH CORPORATION, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**Nos. 18427, 18432.**

United States Court of Appeals Ninth Circuit.

Feb. 7, 1964.

Phillips, Coughlin, Buell & Phillips, Clarence D. Phillips, and H. H. Phillips, Portland, Or., and Willard W. Gatchell, Washington, D. C., for petitioners Portland Gen. Elec. Co. and Publishers Paper Co., in 18427.

Philip S. Ehrlich, Jr., San Francisco, Cal., for petitioner Crown Zellerbach Corp. in 18432.

John C. Mason, Deputy General Counsel, Richard A. Solomon, General Counsel, Howard E. Wahrenbrock, Sol., Thomas M. Debevoise, Asst. General Counsel, Joseph B. Hobbs, and Josephine H. Klein, Attorneys, Federal Power Commission, Washington, D. C., for respondent in 18427 and 18432.

Robert Y. Thornton, Atty. Gen., for the State of Oregon.

Roy C. Atchison, Asst. Atty. Gen., Portland, Or., for intervenor State of Oregon, By Its Fish and Game Commissions in 18427 and 18432.

Before MADDEN, Judge of the Court of Claims, and HAMLEY and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge.

These are proceedings to review an order of the Federal Power Commission granting to petitioners, jointly, a license for hydroëlectric project works at Willamette Falls (Falls) in the Willamette River, Oregon. The petitioners, Portland General Electric Company (Portland), Publishers' Paper Company (Publishers'), and Crown Zellerbach Corporation (Crown), applied for such a license but are not satisfied with some of the provisions of the license tendered.

The license was granted pursuant to the Federal Power Act (Act) § 4(e), as amended, 49 Stat. 840, 16 U.S.C. § 797(e) (1958) and § 15, 41 Stat. 1072, 16 U.S.C. § 808 (1958).[1] This court has jurisdiction under section 313(b) of the Act, as added 49 Stat. 860, as amended, 16 U.S.C. § 825*l*(b) (1958).

Portland is a public utility and operates hydroëlectric power facilities on its own lands in and adjacent to the Willamette River at the Falls.[2] In 1888, Portland leased to Crown certain other lands on the west side of the river, and on an island adjacent to the Falls. In 1908, Portland leased to Publishers' other lands on the east side of the river, and on an island adjacent to the Falls. Crown and

---

1. Section 4(e) pertains to the issuance, subject to certain exceptions and conditions, of licenses for the purpose of constructing, operating and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under the Commerce Clause of the Constitution, or upon any of the public lands and reservations of the United States, or for the purpose of utilizing water or water power from any Government dam.

Section 15 pertains to the issuance of renewal licenses or new licenses for project works concerning which a license was previously issued but has expired.

2. We use "Portland" to indicate not only the present company, but its predecessors.

Publishers' individually constructed and now operate on their respective leaseholds facilities for the development of hydro-electric power and industrial plants for the manufacture of paper and paper products.

The Willamette River is a stream over which Congress has jurisdiction under the Commerce Clause, within the meaning of section 4(e) of the Act. However, the Falls in its natural and present state, constitutes a complete barrier to navigation.

Power development at the Falls was apparently started in the first half of the nineteenth century. In 1873, Portland constructed a canal and locks on the west bank of the river for passage of general river traffic. In 1913, the Government purchased these navigation facilities. From time to time the War Department granted permits under section 10 of the River and Harbor Act of 1899, 30 Stat. 1151, 33 U.S.C. § 403 (1958), for construction in the river adjacent to the Falls.

Shortly after passage of the Federal Water Power Act, 41 Stat. 1063, on June 10, 1920, Crown applied for a license thereunder covering proposed additional dam construction and a planned increase in the power installation at the company's plant. A disagreement arose between Crown and the Commission as to the terms and conditions of the license to be issued. Before this disagreement was resolved and without waiting for the issuance of a license, the proposed construction was undertaken, and was completed in 1921.

On June 13, 1923, Portland filed an application for a minor part license covering the portion of the dam and the power installation constructed in 1920 to 1921. With these two applications before it the Commission, on March 2, 1925, tendered a joint major license to Port-

land and Crown covering the project works already constructed and in existence and which were to be thereafter constructed or acquired at this site, the license to terminate on December 31, 1954. Portland and Crown declined to accept this license, objecting to the pre-license cost as determined by the Commission's accountants. The companies indicated that they desired a license for a minor part of the complete project works, rather than a major license covering all project works.

On August 1, 1929, upon the advice of the War Department that the structures built in 1920 to 1921 were illegal, the Commission rescinded its March 2, 1925 authorization for a license. Portland and Crown were, at the same time, given ninety days to show cause why their pending license application should not be denied. The Commission thereafter modified its position, however, and on November 27, 1929, voted to issue a minor part license covering the 1920 to 1921 construction. The companies indicated their acceptance and, on January 8, 1930 the minor part license for works designated as Project No. 38 was issued with a termination date of December 31, 1954. 1930 F.P.C. Annual Report, pages 62, 82 and 84.[3]

On September 27, 1954, which was three months before expiration of the minor part license, Portland applied for a renewal of the minor part license. The Commission indicated, however, that it would not grant any further minor part license, and requested that petitioners apply for a major license covering all the project works. Portland, proceeding under sections 4(e) and 15 of the Act, filed such an application on July 5, 1957, and sometime later Crown and Publishers' joined as applicants.

In this application the history of the project was summarized, it being stated that, as of 1913, the capacity of Port-

3. Article 10 of this license reads:
   "**Article 10.** The rights of the Licensees, and of their tranferees, customers, and successors covered by this license, for the purpose of maintaining the project works or otherwise, shall absolutely cease at the end of the period thereof, unless a new license shall be issued pursuant to then existing laws and regulations."

land's major power installation at the project, station B, was 8,000 kilowatts.[4] It was further stated that a redevelopment of the station B power plant had been accomplished in 1952, thereby increasing the capacity of this installation to 15,400 kilowatts. No authorization, license or approval of the Commission had been sought or secured for this redevelopment.

The Commission's order now under review, granting a joint major license to the three companies, effective as of January 1, 1955, for a period of fifty years, was entered on June 21, 1960. 23 F.P.C. 831. The project works as proposed to be licensed were embraced within what was designated Project No. 2233.

In July, 1960, each of the companies petitioned for a rehearing, requesting that Articles 9 and 10 of the tendered license be deleted.[5] These articles, pertaining to navigation facilities, were inserted upon the purported authority of section 11 of the Act, 41 Stat. 1070, 16 U.S.C. § 804 (1958).[6] On August 18, 1960, the Commission entered an order granting a rehearing confined to conditions relating to navigation facilities.

Such a hearing was held before an examiner on September 15, 1961.[7] During this hearing the Commission staff took the position that if Articles 9 and 10 were found to be invalid, then the question of whether a license should be issued ought to be re-examined.

The examiner rendered his decision on August 8, 1962, ruling as a matter of law that section 11 of the Act does not apply to any project works constructed before the issuance of the license covering them. He accordingly decided that Articles 9 and 10 should be stricken from the license granted petitioners. The examiner also

4. Although not stated in the application, this capacity had actually been reduced to 4,890 kilowatts by 1950.

5. Articles 9 and 10 of the tendered license read:

"Article 9. Whenever the United States shall desire to construct, complete, or improve navigation facilities in connection with the project, the licensee shall convey to the United States, free of cost, such of its lands and its rights-of-way and such right of passage through its dams or other structures, and permit such control of pools as may be required to complete and maintain such navigation facilities.

"Article 10. The Licensee shall furnish free of cost to the United States power for the operation and maintenance of navigation facilities at the voltage and frequency required by such facilities and at a point adjacent thereto whether said facilities are constructed by the Licensee or by the United States."

6. Section 11 reads:

"SEC. 11 * * * [i]f the dam or other project works are to be constructed across, along, or in any of the navigable waters of the United States, the commission may, in so far as it deems the same reasonably necessary to promote the present and future needs of navigation and consistent with a reasonable investment cost to the licensee, include in the license any one or more of the following provisions or requirements:

"(a) That such licensee shall, to the extent necessary to preserve and improve navigation facilities, construct, in whole or in part, without expense to the United States, in connection with such dam, a lock or locks, booms, sluices, or other structures for navigation purposes, in accordance with plans and specifications approved by the Chief of Engineers and the Secretary of the Army and made part of such license.

"(b) That in case such structures for navigation purposes are not made a part of the original construction at the expense of the licensee, then whenever the United States shall desire to complete such navigation facilities the licensee shall convey to the United States, free of cost, such of its land and its rights of way and such right of passage through its dams or other structures, and permit such control of pools as may be required to complete such navigation facilities.

"(c) That such licensee shall furnish free of cost to the United States power for the operation of such navigation facilities, whether constructed by the licensee or by the United States."

7. In addition to the applicants and Commission staff counsel, the Oregon State Game Commission and the Fish Commission, appearing on behalf of the State of Oregon, and the Oregon Public Utility Commissioner, participated in this hearing.

held that reconsideration to determine whether the license should issue (without Articles 9 and 10) is not justified. 28 F.P.C. 929.

On exceptions filed by the Commission staff, the Commission, on December 3, 1962, issued its opinion and order reversing the examiner. The Commission ruled that section 11 is applicable to project works constructed before the issuance of the license covering it, providing such construction was subsequent to the June 10, 1920 enactment. The Commission denied the request for modification of the tendered license by deletion of Articles 9 and 10 thereof. 28 F.P.C. 924.

Petitioners again petitioned for rehearing, once more requesting the Commission to delete Articles 9 and 10 from the tendered license. These applications were denied on January 21, 1963. 29 F.P.C. 126.

Portland and Publishers', acting jointly, and Crown, acting individually, filed timely petitions to review the order of June 21, 1960, and the subsequent orders as described above, granting the joint major license with Articles 9 and 10 included, and denying motions to delete these articles.

In these petitions for review, objection is also taken to Article 20 of the tendered license, relating to the construction, maintenance and operation of fish ladders, fish screens, or other fish protective devices.[8] Petitioners assert that inclusion of Articles 9 and 10 is not authorized by statute. They further contend that inclusion of Articles 9, 10 and 20 under the circumstances described above is not, and could not be, supported by requisite findings of fact, constitutes an abuse of discretion, and deprives petitioners of due process of law as guaranteed by the Fifth Amendment.[9]

We will first consider problems involving the inclusion of Articles 9 and 10 in the tendered license.

At the outset the Commission suggests that, insofar as Article 9 of the tendered license is concerned, we may not have a justiciable controversy ripe for judicial review. Article 9, the Commission asserts, imposes no immediate burdens or obligations on petitioners and whether it will result in burdens or obligations being imposed in the future is a matter of speculation. California Oregon Power Co. v. Federal Power Commission, 99 U.S. App.D.C. 263, 239 F.2d 426, is cited in support of this position.

The Commission concedes that Article 10 of the tendered license is now reviewable since it imposes a present obligation upon petitioners. The Commission also grants that, in the main, the same legal considerations support both Articles 9 and 10. Since most if not all legal problems involving Article 9 must be dealt with now in connection with Article 10, we see nothing to be gained in the direction of conserving judicial resources or otherwise, in dismissing the review as to Article 9. The suggestion that, as to Article 9, we dismiss the review is therefore rejected.

8. Article 20 of the tendered license reads: "Article 20. Until further order of the Commission, the Licensees shall so operate the project as to continue the operating practices now in effect in the interest of fish resources at Willamette Falls, and shall cooperate with interested Federal and State fishery agencies in making studies for enhancement of the fish resources at the project. The Licensees shall construct, maintain, and operate or shall arrange for the construction, maintenance and operation of such fish ladders, fish screens, or other fish protective devices for the purpose of conserving the fishery resources and comply with such reasonable modifications of the project structures and operation in the interest of fish life as may hereafter be prescribed by the Commission upon its own motion or upon the recommendation of the Secretary of the Interior or the Fish Commission of Oregon or the Oregon State Game Commission, after notice and opportunity for hearing."

9. The two review proceedings were consolidated for hearing. The State of Oregon, by its Fish and Game Commissions, was permitted to intervene in this court. The State, as intervenor, concerns itself only with Article 20 of the tendered license, taking a position in support of the Commission orders.

Inclusion of provisions such as Articles 9 and 10 of the license tendered to petitioners is specifically provided for, under certain circumstances, by section 11 of the Act, quoted in note 6. As indicated in the opening words of that section one of the circumstances which must exist, in order to entitle the Commission under that section to include provisions of this kind, is that the dam or other project works "are to be constructed."

In the proceedings before the examiner the Commission staff took the position that section 11 is applicable at least to project works "to be constructed" subsequent to passage of the 1920 Act. Project works falling in this category, the staff urged, included the works previously licensed as minor part Project No. 38, and the works installed in Station B in 1952.[10] But the petitioners argued, and the examiner held, that since the project works had been completely constructed before the license was applied for, it could not be said that the dam or other project works "are to be constructed." For this reason, petitioners argued and the examiner concluded, section 11 does not, under the circumstances of this case, authorize inclusion of Articles 9 and 10 in the tendered license.

When the matter came before the Commission, the staff and petitioners adhered to their respective positions taken before the examiner. The Commission reversed the examiner and held that section 11 authorized inclusion of the Articles 9 and 10 navigation conditions because the license applied for involved projects constructed after the 1920 enactment.

On this review petitioners renew their argument that section 11 is inapplicable because the project works to be covered by the license were completely constructed before petitioners applied for the license. In support of this position petitioners rely primarily upon the legislative history of the Act, and upon an analysis of the prior statutory requirements.

In support of the Commission's order under review, counsel for the Commission here suggest alternative interpretations of the "to be constructed" provision of section 11, either one of which would sustain the order insofar as the particular objection now under consideration is concerned. One of these is the construction which the Commission adopted, namely, that Congress was speaking as of the time it used the words, thereby providing for the inclusion of section 11 navigation conditions in all licenses covering construction occurring after June 10, 1920.

The alternative construction suggested by counsel for the Commission, is that the only projects exempt from section 11 navigation conditions are "constructed" projects within the purview of section 23(a),[11] i. e., projects previously constructed pursuant to valid federal authorization granted before June 10, 1920. Counsel for the Commission appear to prefer this alternative construction and discuss it at length in their brief.

This alternative construction would appear to obviate some difficulties with the

10. The Commission staff argued, in the alternative, that, apart from section 11, there are other provisions of Part I of the Act which justify inclusion of Articles 9 and 10. The staff relied particularly upon section 4(g), as added 49 Stat. 839, 16 U.S.C. § 797(g) (1958); section 6, as amended 49 Stat. 841, 16 U.S.C. § 799 (1958); and section 10(g), as amended 49 Stat. 844, 16 U.S.C. § 803(g) (1958). The examiner held that since section 11 specifically covers the conditions set forth in Articles 9 and 10, it is not proper to rely on general provisions of the Act.

The Commission found it unnecessary to consider the applicability of these other statutory provisions. On this review Commission counsel takes the position that if we hold that inclusion of Articles 9 and 10 is not authorized by section 11, we should remand the case to the Commission to determine, among other things, whether inclusion of those articles is authorized by other sections of the Act.

11. 49 Stat. 846, 16 U.S.C. § 816 (1958).

Commission's interpretation of section 11, and with the staff's own alternative interpretation.[12]

We do not have the benefit of the official view of the Commission concerning the alternative construction of section 11 now suggested by Commission counsel. Moreover, if we were now to find merit in that construction we could not give application to it on this record. The Commission has made no finding and stated no conclusion as to whether the project in question, or parts thereof, were constructed without valid federal authorization granted before or after June 10, 1920, or whether the existence of a prior valid license is immaterial because this is an application under section 15.

■ These considerations lead us to conclude that this case ought to be remanded to the Commission for further consideration of the question of what statutory authority, if any, the Commission has under section 11, or other provisions of the Act,[13] to incorporate Articles 9 and 10 in this license. Should a construction be adopted which requires a factual basis for application here, the Commission can, on the remand, undertake appropriate proceedings to ascertain such facts and enter the necessary findings thereon.

Concerning the inclusion of Articles 9 and 10 in the tendered license, petitioners present certain additional questions which, if decided in their favor would call for reversal without the necessity of a remand, or would require a remand for purposes additional to those already indicated. We therefore proceed to discuss these questions but only on the assumption, which may ultimately prove to be incorrect, that the "to be constructed" language of section 11 does not preclude the imposition, under that section or other provisions of the Act, of such navigation conditions.

■ Crown contends that the free of cost conveyancing requirements of section 11(b), given effect in Article 9 of the tendered license, apply only to the construction of navigational facilities required because of the obstruction to navigation to be caused by the project works. According to Crown, its structures, located on Moore Island, do not obstruct navigation. Accordingly, the company argues, the Commission was without authority to impose section 11 navigation conditions with regard to its nonobstructing works.[14]

Section 11 is not so limited. Imposition of navigation conditions is authorized if the dam or other project works are to be constructed " * * * across, along, or in any of the navigable waters of the United States * * *." Such conditions are to be activated, however, only insofar as the Commission deems them " * * * reasonably necessary to promote the present and future needs of navigation and consistent with reasonable investment cost to the licensees * * *."[15]

12. We refer to the difficulties suggested by the following statement on page 30 of Portland's opening brief:
"Under the Commission's interpretation, if the construction of project works had been completed prior to 1920, it would be immaterial whether they had been built with federal authorization and were entitled to a license under § 23(a) of the Act [16 U.S.C. § 816 (1958)] or had been constructed in violation of law. In either case, § 11 would not apply. Conversely if project works were completed after 1920 under prior Departmental permit or other federal authority, or were constructed after 1920 without authority, § 11 would apply and the navigation conditions could be imposed."

13. On remand the Commission is not precluded, if it chooses, from exploring the further contention advanced before the examiner and the Commission by the staff that, apart from section 11, the Commission has statutory authority to include such navigation conditions. See note 10.

14. It may be that Portland and Publishers' join in this general contention.

15. The quoted "needs" and "investment cost" limitations are stated in the first paragraph of section 11 as if they were determinative of whether such conditions could be included in a license. This may be practicable with regard to the navigation conditions set out in section 11(a), since those conditions are referenced to

All of the project works in question are across, along, or in the Willamette River, which is a navigable water of the United States. The free conveyancing provided for in Article 9, and the free power provided for in Article 10, could under certain circumstances be reasonably necessary to promote the present and future needs of navigation even though the project works do not obstruct navigation. See United States v. Appalachian Elec. Power Co., 311 U.S. 377, 426–427, 61 S.Ct. 291, 85 L.Ed. 243.

Petitioners argue that, by requiring the licensee to accept a license with the Article 9 provision for the giving of property free of cost for navigation, the Government by indirection is taking property without due process of law, resulting in confiscation.

■■ This is not true because petitioners are not required to accept the tendered license. Any license rights which petitioners ever had to construct and maintain these project works expired in 1954. See note 3. In applying for a major license effective as of 1955, petitioners seek rights they do not now have. In order to gain those rights they must accept the license upon such terms as Congress has determined should be imposed in the public interest. See United States v. Appalachian Elec. Power Co., 311 U.S. 377, 427–428, 61 S.Ct. 291, 85

L.Ed. 243; Fox River Paper Co. v. Railroad Comm. of Wisconsin, 274 U.S. 651, 656–657, 47 S.Ct. 669, 71 L.Ed. 1279. It is not a taking for the Government to withhold a benefit it is not contractually or constitutionally obliged to confer. Nor is it a taking for the Government to impose financial obligations upon the recipient of a benefit if, as here, the benefit may be declined.

Petitioners contend that the license order of June 21, 1960 is defective in that neither it nor any subsequent order contains those basic findings of fact which would justify the imposition of Articles 9 and 10. This argument is based upon the language of section 11, quoted in note 6.

One of the determinations of fact which, petitioners contend, is required by section 11 to be made before Articles 9 and 10 could be lawfully included in the tendered license, is that the dam or other project works are not in existence and are to be constructed.

It is undisputed that the dam or other project works are in existence and therefore the Commission could not make a finding to the contrary. Whether because such a finding cannot be made, the Commission is deprived of authority to impose the conditions set out in Articles 9 and 10 must be reserved for consideration in the event of a review following the

then existing plans and specifications approved by the Chief of Engineers and the Secretary of the Army and made part of such license.

The navigation conditions set out in section 11(b), however, depend upon future conditions not known at the time the license is granted. It is therefore not possible, with regard to those conditions, for the Commission to ascertain at the time the license is issued whether, and to what extent, section 11(b) navigation conditions will be reasonably necessary to promote the present and future needs of navigation and consistent with a reasonable investment cost to the licensee. Thus, with regard to section 11(b) conditions, this determination must be made if and when the occasion arises in the future.

This may also be true of section 11(c) navigation conditions, depending upon

whether the navigation facilities in question are constructed, (1) by the licensee according to plans and specifications known when the license is issued or, (2) by the United States according to plans and specifications not known when the license was issued or (3) are already being maintained and operated by the United States. In the first and third of these circumstances, a finding as to reasonable necessity consonant with reasonable investment cost is required at the time the license is granted since financial burdens under Article 10 are immediately assumed. In the second of these circumstances such findings are not necessary unless and until the Government constructs the facilities and the power requirements become known.

Articles 9 and 10 of the tendered license are based upon section 11(b) and (c), and not upon section 11(a).

remand. It involves the precise question with regard to which the remand is being ordered.

Another determination of fact which, petitioners argue, is required by section 11, if conditions such as those contained in Articles 9 and 10 are to be imposed, is that the project works will be across, along, or in navigable waters.

The Commission did make such a finding in its opinion and order of December 3, 1962.[16]

A third determination of fact which the Commission was required to make, assert petitioners, is that the dam or other project works obstructs navigation and thereby requires the conveyancing of land and the grants of rights of way through structures to permit the construction of navigation facilities.

Since, as we have already held, the application of section 11 is not limited to project works which obstruct navigation, the Commission was not required to find whether the works here in question constitute such an obstruction.

■ A fourth determination of fact which, according to petitioners, the Commission was required to make, is that plans and specifications for required navigational facilities have been approved by the Chief of Engineers and the Secretary of the Army.

This is a statutory requirement only where, pursuant to section 11(a) of the Act, the licensee is obliged to construct, in whole or in part, in connection with a dam to be covered by the license and without expense to the United States, such lock or locks, booms, sluices, or other structures for navigation purposes as may be necessary to preserve and improve navigation facilities.

The tendered license would not, by means of Articles 9 and 10, or otherwise, impose any section 11(a) obligation upon petitioners. Accordingly it is immaterial whether there were then in existence

plans and specifications for such structures approved by the Chief of Engineers and the Secretary of the Army.

■ A fifth determination of fact which, petitioners contend, the Commission was required to make, is that it is reasonably necessary to promote the present and future needs of navigation and, consistent with reasonable investment cost to petitioners, to require them to convey to the United States free of cost such of its project lands and rights of way through its dams or other project works as may be necessary to complete the required navigation facilities.

If section 11(a) navigation conditions had been included in the tendered license, findings of the kind just described would be a prerequisite. But no section 11(a) conditions, placing an obligation upon petitioners to construct lock, boom, sluice or other structure for navigation purposes, have been inserted in the tendered license.

With regard to section 11(b) conditions, manifested by Article 9 of the tendered license pertaining to free conveyancing, findings of the kind described need not and cannot be made unless and until the United States undertakes to complete navigation facilities which would make such conveyancing necessary.[17] If and when the United States, at some future time, desires to construct navigation facilities at the project site, petitioners will, under Articles 9 and 10, be obliged to convey lands and rights of way if, and only if, the Commission at that time makes legally supportable findings of the kind under discussion.

■ The sixth and final determination of fact which, petitioners argue, the Commission was required to make, is that the requiring of the licensee to furnish free of cost to the United States power for the operation of the navigational facilities which are made necessary by the construction of its project works which will obstruct navigation, is necessary to pro-

16. See 28 F.P.C. 924, at 925.

17. For a further expression of our views as to this contention relating to Articles 9 and 10, see note 15.

mote the present and future needs of navigation.

This has reference to section 11(c) of the Act, which is given effect by inclusion of Article 10 in the tendered license. Since the tendered license contains no section 11(a) terms requiring petitioners to construct navigational facilities, the facilities referred to in Article 10 must be those which are already being operated at the site by the United States, or which may be added by the United States at some future time.

As to the navigation facilities already being operated by the United States,[18] Article 10, as the Government concedes, imposes a present obligation on petitioners to provide the electric energy necessary for operation of those facilities.[19] Yet the Commission has not found, with respect to this immediately imposed obligation, as required by section 11, whether the operation of such navigation facilities is reasonably necessary to promote the present and future needs of navigation, and whether the financial burden thus imposed on petitioners is consistent with a reasonable investment cost to the licensees.

Upon the remand which is being ordered, the Commission will have an opportunity to make appropriate findings as to these matters which, depending upon their nature, will establish a factual basis for the imposition of such an obligation or establish that no such obligation may be imposed. With regard to any future navigation facilities at the project which may be constructed by the United States, no findings of this kind need or can be made at this time.

Petitioners argue that the record does not contain any facts upon which the Commission could base findings required by section 11. What we have said above concerning the time when such findings should be made makes it unnecessary to discuss this point.

What we have already said concerning the necessity under the Act, of Commission findings of fact on various matters, is also dispositive of petitioners' contention that the failure to make such findings is arbitrary, unreasonable and deprives them of due process of law. We have held that findings as to particular matters are necessary with respect to the one burden presently imposed. As to burdens not now imposed and which may never be imposed, present findings as to these matters are not practicable. It is not arbitrary, unreasonable, or a deprivation of due process to refrain from making findings as to what conditions may be in the future, at least where no present burden is imposed in contemplation of such conditions.

Crown contends that the attachment of navigation conditions to Crown's lands and structures outside the project boundaries is not authorized by section 11.

▌ Commission counsel expresses the view that there is no basis in fact for Crown's fear that property outside the project boundaries might be demanded under Article 9. But the probability that the conveyance of lands outside the project boundaries will not be required is not an adequate answer if, in fact, Article 9, obligates Crown to convey such lands for navigational purposes upon demand by the Government.

What is an adequate answer, however, is that if the United States should at some future time demand the conveyance of lands outside the project boundaries, Crown will then have its day before the Commission and in the courts, as to

---

18. On July 8, 1913, Portland, then the owner of the canal and locks, sold and conveyed them together with the land upon which they were situated to the United States.

19. Portland points out that at the present rate of payment by the United States for electric power for navigation facilities— about $2,000 a year—the expense to Portland under Article 10 with regard to facilities already in existence would amount to $100,000 over the course of the fifty-year license. The license is to be made effective January 1, 1955 so that, if the tendered license is accepted, Portland would be required, under Article 10, to pay the United States in the neighborhood of $16,000 for power already used.

**176**

whether this is authorized by Article 9 and section 11(b). While Crown would naturally like to know now what its rights would be in that eventuality, a decision at this time would have to be rendered in a vacuum insofar as the pertinent facts of a particular demanded conveyance are concerned.

Crown's acceptance of a license with Article 9 included will not prejudice its right to raise the question later if the occasion should ever require. That is about all of the judicial assurance concerning the matter which the company can reasonably expect to get at this time.

What has just been said is equally applicable with regard to Crown's contention that section 11(b) and Article 9 do not actually, or constitutionally, authorize the United States to demand a conveyance of any lands either inside or outside the project boundaries, which lie above the high-water mark of navigable waters of the United States, or so-called fast lands.

Finally, as to Articles 9 and 10, Portland and Publishers' assert that they have valid property rights at the project site, including water rights duly vested under state law. These rights, it is argued, are expressly recognized by section 27 of the Act.[20] These companies urge that the Commission should have considered these rights before Articles 9 and 10 were included as navigation conditions in the license. They suggest that acceptance of the license with Articles 9 and 10 included, in effect, concludes them from objecting if, at some subsequent time, those articles are invoked and the property of petitioners is either "taken over" by the United States or rendered useless by navigation improvements which the United States desires to make.

If Portland and Publishers' mean to imply that the Commission failed to consider the impact of section 27 in determining to include Articles 9 and 10 in the license, they are mistaken. This matter was dealt with in the Commission's opinion and order of December 3, 1962, 28 F.P.C. 924, 928–929.

The Commission held that to construe section 27 as precluding the imposition of navigation conditions such as those set out in Articles 9 and 10, where, as here, such imposition might affect or interfere with state water rights, would in effect nullify section 11. An interpretation of section 27 that makes it irreconcilable with the specific provisions of section 11, the Commission concluded, would not be a reasonable interpretation.

■ Section 27 of the Act, quoted in note 20 is, in substance, the same as section 18 of the Boulder Canyon Project Act,[21] and section 8 of the Reclamation Act.[22] In Arizona v. California, 373 U.S. 546, 585–588, 83 S.Ct. 1468, 10 L.Ed.2d 542, the Supreme Court held that the latter statutes were general provisions preserving state law which could not override other specific provisions of those Acts. In our view section 27 of the Federal Power Act should be similarly construed as not affecting the right of the Commission to exercise the power specifically vested in it by section 11 of that Act. The only purpose of section 27 is to preserve to holders of state-conferred water rights a right to compensation if those rights are taken or destroyed as an incident to the exercise by another, of a license granted by the Commission.[23]

20. 41 Stat. 1077, 16 U.S.C. § 821 (1958), reading as follows:
  "SEC. 27 * * * [N]othing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."

21. 45 Stat. 1065, 43 U.S.C. § 617q (1958).

22. 32 Stat. 390, 43 U.S.C. § 383 (1958).

23. Cf. City of Fresno v. California, 372 U.S. 627, 629–630, 83 S.Ct. 996, 10 L. Ed.2d 28; Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 291, 78 S. Ct. 1174, 2 L.Ed.2d 1313.

While, as the Commission concedes, the burdens which may be imposed upon petitioners as a result of the inclusion of Articles 9 and 10 in the tendered license may involve interference with the licensees' retention and exercise of water rights, this is a price they must pay if they are to obtain a license. It may fairly be assumed that, without such a license, petitioners' water rights will have relatively little value.

We conclude that, under the facts of this case, section 27 does not stand in the way of inclusion of Articles 9 and 10 in the license.

We turn now to petitioners' argument concerning the inclusion of Article 20, pertaining to fish protection. This article requires the licensees upon request at any time until termination of the tendered license to construct, maintain and operate fish protection devices. It also requires them to comply with such reasonable modifications of the project structures and operation in the interest of fish life as may be prescribed by the Commission.[24]

Section 313(b) of the Act,[25] provides that no objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure to do so. Petitioners raised no objection before the Commission concerning Article 20.

They contend, however, that reasonable ground for such failure exists in this case because they did not know, until it was too late to lodge an objection with the Commission, that extensive upstream fish protection facilities were being proposed by the Oregon Fish Commission. Until this information was available, petitioners contend, the substantial financial burden which might be imposed under Article 20 was not appreciated. They therefore ask us, pursuant to a provision, of section 313(b), to remand the proceedings to the Commission so that they may adduce additional evidence bearing upon the inclusion of Article 20.

The Commission and intervenor dispute the contention that there is reasonable ground for the failure of petitioners. to make objection to the Commission with regard to the inclusion of Article 20. Accordingly, they argue that we are without jurisdiction to consider the matter and that the request to adduce additional evidence should be denied.

Since this license proceeding is being remanded to the Commission in connection with questions concerning the inclusion of navigation conditions in the license we think petitioners should have an opportunity, at that time, to raise their objections and adduce additional evidence concerning Article 20. Accordingly, we do not now decide the Article 20 question.

The cause is remanded to the Commission for further proceedings consistent with this opinion.

---

24. Article 20 is quoted in note 8. Inclusion, under appropriate circumstances, of such a provision, is authorized by section 18 of the Act, 49 Stat. 845, as amended, 16 U.S.C. § 811 (1958).

25. As added, 49 Stat. 860, as amended, 16 U.S.C. § 825l(b) (1958).