The MONTANA POWER COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent.

Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana, Intervenor.

Nos. 15480, 16359.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 19, 1961.

Decided Jan. 25, 1962.

Petition for Rehearing Denied Feb. 21, 1962.

Messrs. Sam B. Chase, Jr., Butte, Mont., of the bar of the Supreme Court of Montana, pro hac vice, by special leave of court, and Joseph A. McElwain, Deer Lodge, Mont., for petitioner. Mr. John C. Hauck, Butte, Mont., was on the brief for petitioner.

Mr. Peter H. Schiff, Atty., Federal Power Commission, with whom Messrs. John C. Mason, Gen. Counsel, and Howard E. Wahrenbrock, Solicitor, were on the brief, for respondent.

Mr. John W. Cragun, Washington, D. C., for intervenor.

Before WILBUR K. MILLER, Chief Judge, and BAZELON and BASTIAN, Circuit Judges.

## WILBUR K. MILLER, Chief Judge.

On May 23, 1930, the Federal Power Commission issued to Rocky Mountain Power Company a license "for the purpose of constructing, operating and maintaining certain project works necessary or convenient for the development and improvement of navigation and for the development, transmission and utilization of power across, along, from and in the Flathead River and Flathead Lake, navigable waters of the United States, being a part of" Project No. 5, known as the Kerr project. The license was for a period of 50 years from the date thereof. It authorized three generating units with a total capacity of not less than 150,000 horsepower, and required construction to be begun within one year and installation of the three units to be completed within three years thereafter.

As the project works would occupy certain tribal lands of the Flathead Indians, the license required the licensee, pursuant to Section 10(e) of the Federal Power Act, 16 U.S.C.A. § 803(e), to pay into the United States Treasury for the use of such lands fixed annual charges for the first twenty years and until the annual charges should have thereafter been readjusted in accordance with the terms of the license.[1]

The project works were not constructed within the time allowed, but by an amendment of July 17, 1936, the licensee was given until May 23, 1939, to complete one unit having a capacity of not less than 77,000 horsepower. A second unit of the same capacity was to be subsequently installed. Although it authorized only two units instead of the originally authorized three, the amendment fixed annual rentals for the tribal lands somewhat higher than the annual charges originally fixed. In 1938, the license as amended was transferred to the petitioner, Montana Power Company. The first of the two units was placed in operation May 20, 1939, and the second unit was completed in 1949.

In 1951, the United States commenced operation of its Hungry Horse dam and reservoir on the south fork of the Flathead River above Project No. 5. Because of the additional storage and regulation provided by Hungry Horse, petitioner on December 3, 1951, filed with the Commission its application for authorization to install a third generating unit. On December 29, 1951, petitioner was authorized to proceed with construction at its own risk, but without prejudice to the application for amendment. Under that authorization, the third unit was completed and placed in operation in December, 1954. Hearings were held June 24 through June 30, 1958, and Sep-

---

1. Section 10(e) is in part as follows:

"* * * [W]hen licenses are issued involving the use of Government dams or other structures owned by the United States or tribal lands embraced within Indian reservations the Commission shall, subject to the approval of the Secretary of the Interior in the case of such dams or structures in reclamation projects and, in the case of such tribal lands, subject to the approval of the Indian tribe having jurisdiction of such lands as provided in section 16 of the Act of June 18, 1934 (48 Stat. 984), fix a reasonable annual charge for the use thereof, and such charges may with like approval be readjusted by the Commission at the end of twenty years after the project is available for service and at periods of not less than ten years thereafter upon notice and opportunity for hearing: * *."

tember 22 and 23, 1958, at which times testimony was presented as to the feasibility of the third generating unit, and as to what a reasonable additional annual rental should be, if any were due, for the use of the tribal lands by installation of the third unit.

The intermediate decision of the trial examiner, issued May 14, 1959, found that the installation and operation of the third generating unit did not use or occupy any lands in addition to those already occupied by the first two units; that

"\* \* \* while the Indian Tribes have contributed nothing in addition to what they had already provided and the increase in capacity of Project No. 5 has been due entirely to elements other than those contributed by the Indians, the provisions of the license require that if Unit No. 3 is to be operated, the Indian Tribes are entitled to additional compensation."

Due to the absence of evidence as to any additional headwater benefits charges because of the use of Hungry Horse water, the trial examiner disregarded that possible element of cost in fixing additional rentals, and found the reasonable annual compensation due the Indians for the additional use of the tribal power site lands to be $50,000.

Montana Power asked the Commission to reopen the proceedings and receive evidence, which it alleged had become available after the trial examiner's report, on the subject of headwater benefits charges for the use of the Hungry Horse storage releases. It averred that consideration of the various proposals made by the Commission's staff as to such charges "is essential to a proper, just and equitable finding and conclusion as to additional Indian rentals, if any, for the Kerr Third Unit."

The Commission on July 16, 1959, denied the petition to reopen the proceedings, saying *inter alia,*

"Pursuant to the requirements of the Act of Congress approved March 7, 1928 (45 Stat. 212, 213), and the Federal Power Act, the fixing of annual charges to be paid to the Indians is one of the necessary determinations to be made by the Commission in the process of licensing project works for the development of power or of power sites on the Flathead Reservation. Such a determination is one of the functions of this proceeding now before the Commission. On the other hand, the determination of the amount of the assessments to be paid by the licensee for any headwater benefits received as contemplated by Section 10(f) of the Federal Power Act is a matter which is not germane to the question of annual charges to be paid to the Indians. Therefore, it would not be appropriate to attempt to take evidence with respect to headwater benefits as part of this proceeding to amend the license to authorize the third unit."

On September 18, 1959, the Commission adopted the trial examiner's initial decision, after having made minor modifications. Thus the Commission fixed $50,000 as the additional annual sum to be paid the Indians, subject to the approval of the Secretary of the Interior.

By letter dated March 9, 1960, the Acting Secretary of the Interior advised the Commission that he would not approve the "additional rental payment of $50,000 to the Confederated Tribes." He said he concurred with the Commission's staff which had recommended an additional annual rental of $63,375 arrived at by using the "Sharing the Net Benefits" method of computation, and indicated he would approve that sum as the additional annual payment.

Thereafter, on May 19, 1960, the Commission reopened the proceeding "for the purpose of affording an opportunity to the parties thereto, including Commission staff, to present such additional evidence as they may deem to be material and relative to the issues involved, and for the purpose of affording the Secretary of the Interior, or his representative,

an opportunity to present evidence, documentary or otherwise relative to the recommendation contained in the Acting Secretary's letter of March 9, 1960."

At the reopened hearing, the Secretary of the Interior presented no evidence in support of the suggestion contained in his letter of March 9, 1960.[2] Evidence intended to show that Sharing the Net Benefits method of computation is "commonly used in the power industry" was introduced by the staff. On November 3, 1960, the trial examiner filed his decision, from which the following is quoted:

"* * * The record now shows, it is true, that in at least three instances over the past 25 years the Commission has used, in determining charges for the use of Government lands and dams, what might be termed a Sharing of the Benefits Method which simply means, as shown by the record herein, a division or allocation between the owner of the hydroelectric facilities on the one hand and the owner of the lands and dams on the other of the difference between the cost of operating a hypothetical, non-existing and non-proposed, steam plant and the cost of operating the proposed plant. It seems clear, however, that there is not inherent in this 'method' a necessity that the division be on a 50-50 basis, as the Staff did in arriving at the amount of $63,375. And it seems equally clear that in determining whether such a method should be used and that the amount should be so divided, it is not only desirable but from the standpoint of fairness and justice there must be taken into account all of the relevant attendant circumstances including the amount, if any, of the relative investment by the parties participating. All of the facts in evidence were taken into account as a predicate for the initial decision of the examiner, and no additional evidence

was presented by either the Secretary of the Interior or by anyone else which make it necessary, desirable, or even appropriate in the opinion of the examiner, to alter or amend the findings made by him in that decision."

On January 30, 1961, the Commission issued an order modifying the trial examiner's decision on the reopened proceeding. It adopted the suggestion of the Acting Secretary of the Interior that the "Sharing of the Net Benefits Method" should be used, and by its use fixed the amount of the additional annual charge to be paid the Indians at $63,375. In the course of its order, the Commission said:

"At the reopened hearing, additional evidence was introduced showing that the Commission has in the past used a method similar to the 'Sharing of the Net Benefits Methods' in three specific instances in fixing the annual charge under Section 10(e) of the Federal Power Act to reimburse the United States for utilization by a licensee of the surplus water power at a Government dam; i. e., joint use of the Government dam by the licensee and the United States. The indicated span of years over which this method has been applied shows a consistency of practice by the Commission in using that method to arrive at reasonable economic results in the cases it has been called on to make such determinations. Moreover, the additional evidence established on the record that the evaluation method discussed above has considerable standing, and, if a particular method of evaluation is to be preferred, that method referred to in the record as the 'Sharing of the Net Benefits Method' is the one to be used.

"The views of the Secretary of the Interior had not been requested and were not available in the record upon

---

2. It was unnecessary and, perhaps, not even proper for him to do so. The Secretary was not a party to the proceeding. While he has a veto power, he is not required to aid the Commission in reaching its determination.

which our initial determination was based, but his views were placed in the record at the reopened hearing. In response to the referral of our initial determination, the Acting Secretary, by letter dated March 9, 1960, advised that 'the additional rental payment of $50,000, to the Confederated Tribes' by the Company resulting from the installation of the third generating unit in its license for Project No. 5 had been reviewed by that Department, and that it was the opinion of that Department 'that the most reasonable method for determining the rental due the Confederated Tribes for the third unit is obtained by using only the method designated as Sharing the Net Benefits. * * * "

In these cases, Montana Power petitions for review of the order of September 18, 1959, which fixed the additional annual payment at $50,000, and that of January 30, 1961, which increased the payment to $63,375. It relies principally upon two contentions: (a) that this Commission had no power to require additional annual charges for the use and occupancy of the Indian lands by the third generating unit, because the payments stipulated in the original license were intended to, and did, cover such third unit; (b) that if additional annual charges are nonetheless due, the Commission used a fatally defective method of computation which has resulted in a grossly excessive annual charge.

A "project" is defined in Section 3(11) of the Act, 16 U.S.C.A. § 796(11) as a "complete unit of improvement or development." On the other hand, Section 3(12) of the Act defines "project works" as "the physical structures of a project." Section 4(e), 16 U.S.C.A. § 797(e), of the Act empowers the Commission to license the construction, operation and maintenance of water power "project works"; it does not authorize the licensing of "projects" as such. We pointed out this distinction in Lake On-

tario Land Development & Beach Protection Ass'n. v. Federal Power Commission,[3] when we said:

" * * * The Commission licenses facilities—dams, powerhouses, transmission lines, and other 'project works' of various sorts—not projects as such. Care must be taken in any consideration of this statute lest an inadvertent shifting of the terms 'project' (which is a whole development) and 'project works' (which are structures) cause confusion."

As we have said, the original license authorized three project works, but the amendment thereof to which we have referred authorized only two generating units. When the petitioner sought authority for a third unit, the Commission granted it by way of further amendment to the original license to show the newly authorized third unit was a project works for an existing project; but it was by no means a part of the project works theretofore licensed. Thus, the additional authority, although called an amendment, was a new and original license for the third unit, within the meaning of Section 4(e) of the Act, and was subject to the requirements of Section 10(e) with respect to the use of the tribal lands.

The Commission does not necessarily license all the project works of a given project at one time. It may, as it did here, grant authority for the installation, operation and maintenance of certain project works upon prescribed conditions as to construction and payments; but such a license does not cover additional works, as the petitioner seems to have recognized by applying for the licensing of the third unit. The provisions of the license concerning the initial installations as to payments and other conditions cannot logically be said, it seems to us, to project into and become parts of a new license for different and additional project works.

3. 93 App.D.C. 351, 356, 212 F.2d 227, 232, cert. den. 347 U.S. 1015, 74 S.Ct. 871, 98 L. Ed. 1138 (1954).

For these reasons, we have no difficulty in concluding that the Commission had power, in the circumstances, to impose an additional annual charge for the use of the Indian lands in connection with the installation and operation of the third generating unit.

Had the original license of 1930 for three generating units remained unchanged, there might be some force in petitioner's argument that the charges therein fixed were intended to cover the third generating unit here involved; but, as we have seen, that authority was reduced to two units, with respect to which designated annual payments were required. We think the record supports the Commission's finding that the charges fixed in the amended license of July 17, 1936, related only to the use of tribal lands then being licensed.

■ We next consider Montana Power's contention that headwater benefits payments on account of the use of the Hungry Horse reservoirs should be included as a cost of its third generating unit, and as an element to be considered in determining the additional payment to the Indians. Acceptance of petitioner's argument would prevent the determination of rentals for the use of tribal lands as an incident to the licensing of new project works, and would thus defeat the apparent requirement of Section 10(e): that the determination of rentals be made before the licensed facility is put in service. Annual headwater benefits payments under Section 10(f) cannot be determined until the downstream installation has been constructed and in operation for at least one year. It seems clear, therefore, that the Act contemplates the determination of annual charges for the use of Indian lands before the determination of headwater benefits payments.

There is nothing in the statute which requires the compensation for the use of tribal lands to depend, to any extent, upon the amounts paid by the licensee for headwater benefits. The annual charges shall be reasonable, Section 10(e) says, and must be approved by the Secretary of the Interior and the Indians themselves; otherwise, the statute is silent as to how Indian rentals shall be computed. So, the only question is whether the rental fixed by the Commission is reasonable. Whether headwater benefits payments by the licensee should have been considered is not relevant, unless it appears that the failure to consider them made unreasonable the Indian rentals fixed by the Commission. This does not appear.

■ We therefore affirm the order of September 18, 1959, fixing an additional annual payment on account of the third generating unit, as a valid exercise of the Commission's regulatory power; and we hold it was unnecessary to determine the headwater benefits payments before determining the Indian rentals.

■ There remains for consideration the petitioner's attack on the order of January 30, 1961, which, after reopening, increased the annual additional charge for the use of tribal lands to $63,375. The Commission in overruling its trial examiner's adherence to his original determination of $50,000 and in fixing the additional annual payment at the larger sum, may have been influenced by what it probably regarded as the practical necessity of fixing a figure which would be approved by the Secretary of the Interior, although the latter does not have expertise in such matters comparable to that of the Commission. But, whether so or not is not for us to decide. Our task is simply to ascertain whether the evidence as a whole affords a basis for the Commission's decision, regardless of what we may think its real motive was, and regardless of whether we might have reached a different conclusion. That is to say, we must decide whether the record shows a rental of $63,375 to be unreasonable.

Whether the Commission properly adopted and correctly applied the "Sharing of Net Benefits" method of computing the additional payment is not the question. The question is, rather, whether the end result is a reasonable one, as the statute requires it to be. In our view, the petitioner failed to show that $63,375 is an unreasonable rental.

Affirmed.