The **MONTANA POWER COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Confederated Salish and Kootenai Tribes, etc., Secretary of Interior, Intervenors.

The **CONFEDERATED SALISH** and Kootenai Tribes of the Flathead Reservation, Montana, Petitioners,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Montana Power Company, Intervenor.

Nos. 21904, 21767.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 19, 1971.

Decided Feb. 17, 1972.

Mr. Charles A. Horsky, Washington, D. C., with whom Messrs. G. Joseph Vining, Willard W. Gatchell, Washington, D. C., and Joseph A. McElwain, Butte, Mont., were on the brief, for petitioner in No. 21,904 and intervenor in No. 21,767. Mr. John C. Hauck, Butte, Mont., also entered an appearance for petitioner in No. 21,904.

Mr. Richard A. Baenen, Washington, D. C., with whom Messrs. Charles A. Hobbs and Jerry C. Strauss, Washington, D. C., were on the brief, for petitioners in No. 21,767 and intervenors in No. 21,904.

Mr. David F. Stover, Atty., Federal Power Commission, with whom Messrs. Richard A. Solomon, General Counsel at the time the brief was filed, Peter H. Schiff, Solicitor at the time the brief was filed, Drexel D. Journey, Assistant General Counsel, and William H. Arkin, Atty., Federal Power Commission, were on the brief, for respondent.

Mr. A. Donald Mileur, Atty., Department of Justice, with whom Mr. Clyde O. Martz, Asst. Atty. Gen., at the time the brief was filed, Messrs. Roger P. Marquis, Atty., Department of Justice, and George Miron, Associate Solicitor, Reclamation and Power, Department of the Interior, were on the brief, for intervenor in No. 21,904.

Before FAHY, Senior Circuit Judge, and TAMM and LEVENTHAL, Circuit Judges.

FAHY, Senior Circuit Judge:

The cases challenge the correctness of the amount of annual rental charges the Montana Power Company has been ordered by the Federal Power Commission to pay to the Confederated Salish and Kootenai Tribes of Indians of the Flathead Reservation for use by the Company [1] of lands of the Tribes. The lands are used in the Company's Kerr Hydro-Electric Development on the Flathead River in Montana,[2] operated under a license issued in 1930 by authority of the Federal Water Power Act of 1920,[3] and the Act of March 7, 1928.[4] The original license was for fifty years. The dam itself is 381 feet long and 200 feet high. It was built by the Company but is entirely on Tribal land. The Tribes also own one half of the land of the reservoir, known as the Flathead Lake. In addition to the dam and reservoir, the Kerr project consists of three power generating units, built by the Company. Upstream from Kerr is a development known as Hungry Horse, owned by the federal government, and with a large storage capacity. The release of waters from Hungry Horse accordingly affects the flow downstream to Kerr, and this as we shall see affects the calculations used in arriving at the rentals due the Tribes.

When the license was issued in 1930 the applicable statutes referred to above provided that the annual rentals due the Tribes should be fixed by the Power Commission, and that after 20 years of service the charges "may be readjusted . . . in a manner to be described in each license." The license so provided in a manner leading to arbitration unless the rentals were reached by mutual agreement under procedures set forth in the license. When the Commission was reorganized as an independent agency in 1935, however, an amendment to the statute vested in the Commission the authority to readjust the charges, subject to judicial review. The Company, in an earlier stage of the present litigation, challenged the validity of this amendment, claiming it invalidly departed from the license terms. In Montana Power Co. v. Federal Power Comm., 144 U.S.App. D.C. 263, 445 F.2d 739 (1970), cert. denied, 400 U.S. 1013, 91 S.Ct. 566, 27 L. Ed.2d 627 (1971), this court en banc, supplanting an opinion of one of its divisions, rejected the Company's challenge to the jurisdiction of the Commission to readjust the rentals. The en banc court left the merits of the readjustment which had been made by the Commission to be considered by the available two members of the original division and another judge to be drawn by lot, under the court's longstanding procedure, to take

[1]. Our reference to the Company includes the present Company's predecessor.

[2]. The Kerr project is also known as Project No. 5.

[3]. Ch. 285, 41 Stat. 1063. This act was restated and modernized by the Federal Power Act of 1935, ch. 687, 49 Stat. 838, 16 U.S.C. §§ 791–823 (1964).

[4]. Ch. 137, 45 Stat. 200, 212–213.

the place of Honorable Warren E. Burger, who was becoming Chief Justice, and who had been the third member of the original division. The case is now before the division thus composed.

The principal questions arise on the petition for review filed by the Company in No. 21904, which we consider first. We then consider the petition of the Tribes in No. 21767.[5]

### I

The following provisions of Section 10 (e) of the Federal Water Power Act, as worded when the original license was issued, are basic to the Commission's responsibility:

> [W]hen licenses are issued involving the use of . . . tribal lands embraced within Indian reservations the commission shall . . . fix a reasonable annual charge for the use thereof, and such charges may . . . be readjusted at the end of twenty years after the beginning of operations and at periods of not less than ten years thereafter in a manner to be described in each license.

Federal Water Power Act of 1920, ch. 285, § 10(e), 41 Stat. 1069.

The first unit of the Kerr project became operative in 1939, and the second unit in 1949, at which time the annual rental charges totaled $175,000. This amount was increased by $63,375 when the third and last unit became operational in 1954, making then a total of $238,375. In 1959, twenty years from May 20, 1939, when the project first became operational, the Tribes petitioned[6] for readjustment under Section 10(e). The ensuing proceedings were first before an Examiner, who would have readjusted the annual charges at $850,000. There followed exceptions to his Findings and Conclusions, in turn followed by the

disputed Commission's Finding and Order now being reviewed.[7] The Commission held (1) the Kerr project was available for and began commercial operations May 20, 1939; (2) the readjusted annual charges should be effective 20 years from May 20, 1939; (3) the readjustment should include the third unit; and (4) the readjusted annual charges are $950,000, with simple interest at 6 percent. We affirm the Commission, with a modification of the interest item.

We now review the several problems presented by the Company's petition in No. 21904 and give our reasons for sustaining the Commission except as to the interest.

### II

■ The Company contends that Section 10(e) does not permit a *de novo* determination of the rentals, but requires the Commission as a first step in the new inquiry to assume the reasonableness of the original charges, to be modified only as changed circumstances might warrant. The contention is summarized by the Commission as follows:

> Montana Power argues that the Commission should be limited to its determination of reasonable annual charges to modifying the annual charges previously determined to reflect any changed circumstances.

The Commission rejected this position, stating:

> Nothing in Section 10(e) of the Federal Power Act or in the Kerr license suggests such a limitation. These sources provide two broad standards: one, that the charges be based on the commercial value of the lands for the most profitable purpose; and second, that they be reasonable. In our opinion the reasonable commercial value of the land cannot be determined by

---

5. The Secretary of the Interior, in light of his special responsibilities with respect to the affairs of the Indians, was permitted to intervene before the Commission, and retains intervenor status in these court proceedings.

6. The petition was actually filed May 19, 1959.

7. Applications for rehearing before the Commission had been denied.

considering individual factors in isolation. Instead, in fairness to all parties the entire analysis must be made *de novo*. This, it should be noted, is the established practice in rate cases followed by this, and most other regulatory agencies.

Under applicable principles of law we accept, because reasonable, this interpretation by the Commission of the governing provision of the statute it administers.[8] Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964); California Co. v. Udall, 111 U.S.App.D.C. 262, 266, 296 F.2d 384, 388 (1961). In fulfilling its responsibility of fixing the rentals at intervals separated by a number of years it is more reasonable to interpret Section 10(e) to permit the Commission to redetermine the rentals than to be bound to an earlier standard not currently acceptable in comparison with others. Moreover, it is implicit in the Commission's decision that the original charges had become unreasonable within the meaning of California Oregon Power Co. v. Federal Power Comm., 99 U.S. App.D.C. 263, 239 F.2d 426 (1956), cited by the Company for the position that the readjustment of charges only follows when the current charges have become unreasonable.

### III

■ The Company contends that it was error for the Commission to include charges for the third unit in these proceedings which were initiated in 1959, because that unit was not placed in operation until 1954, so that 20 years of its serviceability would not arrive until 1974. The Company points out that the original authorization was for three generating units, reduced in 1936 to two, followed in 1951 with authority for the third unit, which, as we have said, became operational in 1954. The Company further points out that this court in

Montana Power Co. v. Federal Power Comm., 112 U.S.App.D.C. 7, 298 F.2d 335 (1962), involving the dispute over charges for the third unit, described the grant of its authority as a new license, rather than as an amendment of the original license, as it was characterized by the Commission. It is said to follow that a new reasonable annual rental embracing the third unit may be imposed only after 20 years from 1954. Due to our earlier decision that the authorization of the third unit was by a new license the Company relies upon the doctrine of res adjudicata.

We think the solution of the problem does not turn on whether the authority for the third unit was a new license or an amendment of the 1930 license. The third unit had become part of the Kerr project when in 1959 the project itself had been operational for 20 years. The Company itself took the position in the Third Unit case that the rentals for the whole project, which had already been fixed, included rentals for this additional facility notwithstanding it had not been considered in the rental determination. This court disagreed, as follows:

> As we have said, the original license authorized three project works, but the amendment thereof [of 1936] to which we have referred authorized only two generating units. When the petitioner [the Company] sought authority for a third unit, the Commission granted it by way of further amendment to the original license to show the newly authorized third unit was a project works for an existing project; but it was by no means a part of the project works theretofore licensed. Thus, the additional authority, although called an amendment, was a new and original license for the third unit, within the meaning of Section 4(e) of the Act, and was subject to the requirements of Section 10(e) with respect to the use of the tribal lands.

8. The Commission supports its position also by referring to the following meaning of "to readjust" in Webster's New International Dictionary (2d Ed. 1939): "to adjust or settle again or anew."

112 U.S.App.D.C. at 11, 298 F.2d at 339. While the court refers to the authority for the third unit as an original license, it does so in a context which brings the unit into life as part of the Kerr project.

When 1959 arrived the whole project had taken form. Section 10(e) provides for readjustment of the charges at the end of twenty years after the beginning of operations [9] and at periods of not less than ten years thereafter. Under the Company's position there would be three twenty year intervals for the same project, 1959 for the first unit, 1969 for the second and 1974 for the third, with readjustments permissible for each unit in not less than separate ten-year intervals. It seems entirely reasonable for the Commission to have interpreted the Act to authorize it to readjust the rentals as the project stood at the end of 20 years from the beginning of its operations. The language of Section 10(e) is that readjustment may be made "at the end of twenty years after the project is available for service . . . ." The project was available for service, as it then existed, in 1939.[10] The other two units, like the first, are "Project works," to be distinguished from the "project." Section 3(11) of the Act defines "Project works" as "the physical structure of a project." With these distinctions as a guide to interpretation it was not unreasonable to rule that at the end of twenty years the three units constituted the "project" whose rentals could then be readjusted for the future.

### IV

█ Should the rentals as readjusted in proceedings initiated in 1959 be made effective as of that year, although the proceedings were not concluded until some years later because of their protracted character? The Commission determined they should be, as had the Examiner. The Company, for a contrary position, relies primarily upon the words "shall have been effected" in Article 30 (A) (3) of the license. That Article, after setting out the schedule of annual charges which had been fixed for periods ending in 1954, provides:

> Thereafter, until adjustment of the annual charges payable hereunder shall have been effected pursuant to the provisions of paragraph (D) of that Article . . . $175,000.[11]

The Commission relies upon the language of Section 10(e) of the Act, as amended, and of Article 30(D) of the license. The former provides, to repeat, that readjustment may be made "at the end of 20 years after the project is available for service," and the latter "at the end of twenty years after the beginning of operations under the license." The Commission interprets these provisions to require the language of Article 30(A) (3), relied upon by the Company, to mean only that until the readjustment proceedings are concluded the rentals shall continue to be paid as previously fixed, but that when the proceedings are concluded the readjusted rentals may be made effective from the end of the 20 year period.

In support of its interpretation the Commission pointed out,

> To hold that no readjusted charge could become effective until promulgated after appropriate hearing not only would· encourage litigation but

---

9. The language "the beginning of operations" appears in Section 10(e) as originally enacted. In 1935 when it was amended, "the project is available for service" was substituted. There is no contention that this 1935 language means anything different from the 1920 language. The two phrases, therefore, are used interchangeably in this opinion.

10. Section 3(11) defines "project" to mean a "complete unit of improvement

. . . . " This cannot in reason be interpreted to mean only when all units are in operation, for surely rentals were not meant to wait until all of three possible units became operational.

11. $63,375 was added in the Third Unit case in 1961, "effective as of December 1, 1954." This brought the rentals up from $175,000 to $238,375 prior to the present case.

would place a premium on delay, dilatory tactics and protraction of that litigation.

We find no reason to disagree with the Commission's interpretation of the statute. The readjustment "at the end" of the 20 year period in this case was for the period then beginning until the rentals would again be readjusted as permitted by the statute. A contrary position is not required in the interest of fairness to the Company. The Examiner's decision was rendered as long ago as August 4, 1966, and would have fixed the rental charges at $850,000 per annum. The Company was thus aware more than five years ago of the distinct possibility of a very substantial increase. Prior to 1966 there was a delay of several years due to the litigation of the Third Unit case, initiated by the Company and finally disposed of by this court in February 1962. Moreover, a substantial amount of time is necessarily involved in administrative and judicial processes in a matter of this kind. It is altogether reasonable to construe the statutory and license provisions, relied upon by the Commission, as authorizing the Tribes to receive for the period of the delays the increased rental found to be appropriate.

When in 1967 the proceedings eventuated in the Commission decision now under review, that decision was that the rental charges then determined were the reasonable charges to which the Tribes were entitled for use of their lands in 1959 and thereafter. The charges were not fixed as of 1967 and made retroactive to 1959. They were fixed in 1967 as the amounts which were reasonable in 1959. Statute and license envisage that when it is decided by the Commission at the end of the 20 year period, or later at the end of an ensuing ten year period, to readjust the rental charges, they may be readjusted as of the beginning of the period, as here was done. Considerations may be advanced—see Judge Leventhal's separate and partially dissenting views on this phase of the case—for a different position, but other considerations support the position of the Commission. Thus, unless the Commission's position is sustained, the Tribes would be deprived of the rentals which represent the value to the Company of the use of their lands during the years covered. Moreover, in light of the result reached in this case, the probabilities are that a greater value had attached to the use of the lands for a significant period prior to the end of the 20 years, but payments representing the value could not be obtained by the Tribes. It is not possible accurately to measure such a matter, but neither is it possible to say that the rigidity of the 20 and 10 year periods, during which the payments cannot be changed, does not operate equitably for all parties; or in any event not so unevenly as to require the court to disagree with the Commission in its resolution of the problem.

V

■ The Commission fixed the readjusted annual rental charges to be paid by the Company to the Tribes at $950,-000. The basic criteria are those of Article 30(D) of the 1930 license, which calls for

. . . reasonable charges fixed . . . upon the commercial value of the tribal lands involved, for the most profitable purpose for which suitable, including power development.

Thus it was the task of the Commission, and this is not disputed, to determine the commercial value of the lands to the Company for the most profitable purpose for which the lands were suitable. And there is no dispute that the most profitable purpose to which the Tribal lands could be devoted was the development of power.

Moreover, the Company does not dispute, except in the respect separately considered in Part VII, *infra*, the amounts of Company revenues representing value or income used by the Commission in arriving at the over-all values of Company operations. It does vigorously dispute the correctness of the allocation of those amounts among the several revenue producing operations of the Compa-

ny, contending that too large a share was apportioned to Kerr. It contends that a quite different result would have been reached had not the amounts been subjected to the results of improperly formulated formulae. Thus, the basic difference between the Commission and the Company is over the methodology used by the Commission, not over the calculations made in applying the method adopted. The two theories most favored by the expert witnesses were the "net benefits theory" and the "profitability" theory. The former would require computation of the amount by which the annual cost of production of power at the Kerr project is less than the cost of producing a like amount of power by the most likely alternative at the time Kerr was constructed. Under the profitability theory there would be a determination of the share of the total electric revenues of the Company attributable to Kerr, less the annual cost of producing power at Kerr, including a reasonable rate of return on the net investment of the Kerr facilities, but not including in costs the rentals for the Tribal lands. The result thus reached would be the commercial value of Kerr to the Company. There would then be a determination of how much of this value should be attributed to use by the Company of the Tribal lands.

The Commission accepted the profitability method as the yardstick it would use. It was the method advanced by the Tribes' witness Van Scoyoc. In applying this method, however, the Commission did not accept Van Scoyoc's calculations, and arrived at rental charges substantial-

ly below those the witness himself advanced.

A principal reason the Commission accepted the profitability theory, in preference to the net benefits theory, aside from its view of the reasonableness of the former in and of itself, was that the net benefits theory would call on the Commission to speculate as to the possibly alternative projects. Moreover, we think it important to note, the Commission, while following the analysis by the witness Van Scoyoc of the profitability theory, decided the case on the record as a whole, which contains a great deal of data from different sources. Included are results which would have been reached had the Commission followed the net benefits method, results which supported the reasonableness of the end result reached by the Commission.[12]

The basic test, however, is whether the profitability method was a reasonable one for the Commission to follow. We explain it more fully now, and consider the Company's principal objection to its use. A first step was to ascertain the Company revenues attributable to Kerr. The Company books did not assign revenues to the Company's several facilities. The Commission, however, ascertained the total electric revenues of the Company derived, respectively, from generation, transmission and distribution. This it did, as phrased in its brief, by assigning to each of these three categories "the costs assigned to each . . . including the average return on investment that the company's rates had generated in each year [1958–1964] studied."[13]

12. If the amount of rentals supported by the two expert witnesses for the Tribes, and the witnesses for the Secretary of the Interior and the calculations of the Commission staff, were averaged, the rentals thus proposed would have exceeded those fixed by the Commission. And if the amounts reached by the Company witnesses were included in the averaging the rentals proposed would have been approximately $880,000.

13. The Company described the manner in which the total generating revenues were

reached as follows: "the Commission assumed that each dollar of investment . . . produced the same number of dollars of income." On this assumption the Company's revenues were assigned to groups of assets in proportion to the Company's investment in each, that is, to production, transmission and distribution. The Tribes state that this first step is more accurately described as an apportionment among generation, transmission and distribution of "operating income" rather than "revenues," for revenues are before expenses and income is not.

The principal objection of the Company is to the next step in the method used by the Commission. After the assignment of the Company electric revenues representing value, or income, to generation, an allocation was made to the Kerr generating facility of its share. Here the Commission, following the profitability method, added the factor of capacity in making the distribution of value to Kerr, thus, the Company contends, unduly augmenting the apportionment of generating values to Kerr in comparison with the other generating plants of the Company. We find this objection untenable. We think it was reasonable for the Commission, and not arbitrary as contended, to recognize the greater comparative generating capacity of Kerr in determining its value to the Company due to its use of the Tribal lands in which the Company had no investment and which are not included in its rate base. The license, as the Tribes point out, requires a rental based on " . . . commercial value of the tribal lands involved." The comparative output of electric energy of the several generating plants is an appropriate factor for Commission consideration in arriving at the respective contribution of each to the profits of the Company attributable to generation. Capacity of production, moreover, is a factor to be considered in the relative contribution of the several plants to the earnings of the Company.

## VI

After determining the value of Kerr to the Company there remained the problem of assigning to the Tribal lands their share of this value. This would be the annual rental to which the Tribes would be entitled.

The percentage of total Kerr value approved as rental for the Tribal lands in the Third Unit case, which was before this court in 1962, was 25 percent. Montana Power Co. v. Federal Power Comm., 112 U.S.App.D.C. 7, 298 F.2d 335 (1962). The Company contends that the reasons which led to that percent remain sound and should govern this case. The Commission, on the other hand, now found 42.13 percent to be more reasonable. An analysis of the reasons for the 25 percent in the Third Unit case convinces us that the percentage is not impregnable to an increase on the basis of the present record. The earlier decision attributed the annual "value" of the Kerr project one half to Tribal lands and one half to Company investment; and since the Tribes owned only half the lands under the project, and made none of the investment, their share was calculated as one half of one half, or 25 percent. This ignored differences in land values, particularly the special value of the narrow canyon, wholly owned by the Tribes, where the dam itself was constructed. Except for this, both Company and Commission agree on the basic division of values as one half to Company and one half to Tribal lands, for the land without the Company investment would see no Kerr project, nor would there be an investment without the Tribal lands.

The manner in which the Commission arrived at the 42.13 percent is as follows: Measuring electric generation in Megawatt months (MWM) the Commission considered the separate percentage values, so measured, of the damsite, the Flathead reservoir, and the upstream releases of water from Hungry Horse. Total power generation was determined to be 1194 MWM. Of this total 161 MWM were attributed to the natural stream flow (13%), 657 MWM to Hungry Horse (55%), and 376 MWM to the Flathead reservoir (32%.).[14] The amount, exclusive of the reservoir, is thus 818 MWM (161 plus 657) or 68.5 percent of the total. This percentage was assigned to the damsite, and half, or 34.25 percent, was then assigned to the

---

14. The brief of the Commission states that the reservoir contributed 251 MW months, for a total of 1069, whereas the Company states the reservoir contributed 376 MWM, which would make a total of 1194 MWM. The parties agree on the percentages involved, and the figures used by the Company are accurate.

Tribes because of their ownership of the damsite, and half to the Company because of its investment in the dam. The Tribes were also assigned one quarter of the value to the Company of the reservoir, because they owned half the land. This came to about 8 percent, which, added to the 34.25, totals the 42.13 percent. When this percent was translated into dollars it came to $950,000, the amount fixed by the Commission as annually due the Tribes as the rental charges for use of their lands.

The Company contends that the value of all the Hungry Horse releases of water was assigned to the Tribes in the above calculations, and that this was erroneous. While the total value of the Hungry Horse releases of water was assigned to the damsite, since the Company built the dam the total was divided one half to the Tribes because of ownership of the specially valuable natural damsite, and one half to the Company by reason of its investment in building the dam facilities there. We do not think this was an assignment to the Tribes of the value of all the water releases of Hungry Horse.[15]

Another objection of the Company is that the Commission attributed a separate percent (13 percent) of the Kerr power production to the natural flow of the Flathead River, instead of considering the factor of natural flow as having merged with the factor attributed to the reservoir. This would be a valid objection only if the natural flow production (161 MWM) had been accounted for in the percent attributed to the reservoir storage (376 MWM), which we do not find to be the case. Treating the stream flow separately does not seem to the court to be unreasonable, for it makes a contribution independently of the Flathead reservoir; and its power contribution, like that of Hungry Horse, is due primarily to the dam at the site owned by the Tribes, rather than to the land under the reservoir,[16] of which the Tribes own only one half.

We conclude on the basis of the above analysis of the Company's principal objections, and also because the end result seems reasonable—in awarding to the Tribes 8% less than half the total value of Kerr in terms of power production—that the rental charges fixed by the Commission should be accepted as within its competence. The location of the Indian lands through which the river flows is the basic value ingredient of the Kerr project, which justified the Company's investments there.

## VII

The Company also contends that the result reached by the Commission in calculating the Company's income attributed to Kerr, inflated by benefits derived from Hungry Horse releases of water, excludes the costs paid by the Company for the use of that water in the form of "headwater benefits," totaling $670,000 in the relevant years.[17] The Commission agrees that these benefit payments are operating expenses. It states, however, that they are offset by

15. The location of Hungry Horse upstream from Kerr materially increased the water power at the Kerr damsite. The Kerr value is materially increased as a consequence of its location in relation to Hungry Horse.

16. The reservoir contribution of 376 MW months (see note 14, supra) contains an adjustment upward of 1.5, as the Commission states, to account for the fact that Kerr's "Storage should probably have some additional credit for re-regulation of releases from Hungry Horse, simplifying operations at Hungry Horse and daily and weekly bondage for Kerr Power Plant."

17. The Company also contends that having paid for the use of Hungry Horse releases it should not be required also to pay the Tribes "for the use of this [Hungry Horse] water made available by the United States." The Company's witness Seymour appears not to agree, since he attributed to the Tribes a share of the increased value of Kerr due to the Hungry Horse releases. In any event, the operating expense of the Company represented by benefits paid to the United States for the Hungry Horse releases does not obviate the increased value of the damsite on Tribal lands due to those releases.

payments to Kerr of headwater benefits by downstream plants. The Company counters by asserting that such payments were included in Kerr revenues. We are unable to find that the record supports the view that they were included in the revenues used in the calculations on which the Commission assigned the income attributable to the Kerr site. We take hold of no factual basis for overturning the Commission's resolution of this dispute. Moreover, there is some evidence that the Company received more in the form of net profit for headwater benefits it conferred than it paid for those it received.

## VIII

In sum, the testimony of the witnesses upon which the Commission relied, and the added data placed in the record, give substantial evidentiary support to the amount determined by the Commission, and the several objections of the Company to the method used in arriving at the amount do not persuade us to disagree with the Commission except as to the item of interest, now considered.

## IX

█ The Examiner concluded that the annual charges "shall bear simple interest at the rate of 4 percent per annum." The Commission raised this to 6 percent per annum from the effective date of the readjustment, May 20, 1959, to be paid "on the difference between the rent it actually paid and that rent we have found to be fair and reasonable herein." The Commission stated that this rate accorded with its holdings in closely analogous situations, citing Wisconsin Michigan Power Co., 31 F.P.C. 1445, 1462 (1964). In the Third Unit proceeding, however, involving this Kerr project, the Commission had provided for interest at only 4 percent per annum. It felt not bound now by that decision, stating that equity "requires selection of a rate of interest which more closely approximates the prevailing commercial rate of return, i. e., 6 per cent." But not only had the Commission in the Third Unit case fixed

4 percent, but in the present phase of the case, no doubt influenced by the rate the Commission had fixed in the earlier case, the Examiner also fixed the rate at 4 percent. In view of this situation, coupled with the fact that Congress has provided that rentals for the use of the Indian lands "shall be deposited in the Treasury of the United States to the credit of said Indians, and shall draw interest at the rate of 4 per centum" (45 Stat. 200, 213 (1928)), we think equity calls for no more than 4 per cent now. The Order of the Commission will be modified accordingly. In so holding, however, we agree that the Commission was not absolutely bound by the Third Unit decision, and, moreover, our ruling is not to be interpreted as applicable to other cases or situations not before us. We hold, rather, that in the exercise of a sound discretion, the rate of interest found proper by the Examiner in this case should have been approved. Long delays in final resolution of the controversy, as evidenced by the understandable litigation of the jurisdictional question in Montana Power Co. v. Federal Power Comm., 144 U.S.App. D.C. 263, 445 F.2d 739 (1970), argue that some part of the costs of the delay be divided among the parties, insofar as the rate of interest is concerned. We add in support that at least since 1962, when this court, in deciding the Third Unit case, approved the 4 percent annual interest rate, the Company has had reason to believe that in regulating its affairs it would not be called upon to pay a higher rate in the present case.

## X

█ The court is not without jurisdiction, as seems to be suggested by the Company, relying on the provision of Section 10(e) that the annual charges must be approved by the Secretary of the Interior, for our affirmance of the Order of the Commission, which is in full except for modification of the interest rate, is, as the Secretary concedes, binding upon the Secretary, and is not merely an advisory opinion. The Secretary

had approved the Commission's determination of the amount of rentals to be paid by the Company. Moreover, here, as in the Third Unit case, the court's decision is on the merits of the Order of the Commission; that is to say, the Order stands free of any discernible "taint" emanating from the performance by the Secretary of his responsibility under the applicable statutory provisions. *See* Montana Power Co. v. Federal Power Comm., 112 U.S.App.D.C. at 12, 298 F.2d at 340.

The Secretary is a public figure who could not insist on withholding approval unless the rental rate to be paid were unreasonable. Considering the applicable statutes together he may approve a rental offered by the Company, and he may negotiate for an approved consensual arrangement; but if there is no agreement and the matter goes to the Commission, the Secretary can refuse to approve the rate fixed by the Commission only by seeking court review of its determination. As is the situation with the Tribes, the Secretary can participate as a party and avail of the provisions for judicial review.

## XI

▌ In No. 21767, the Tribes contend that on the basis of the evidence that the excess of benefit payments to Kerr exceeds the costs of the headwater payments by Kerr, the rentals to the Tribes should have been lifted by the Commission by some $42,000. The evidence relied upon by the Tribes, however, embraces a period which does not coincide with the study period used by the Commission. Primarily for this reason the Commission, we think properly, refused to revise its determinations to take account of the evidence relied upon by the Tribes, assuming its accuracy. With this we agree.

1. 16 U.S.C. § 791 et seq. (1964).

2. The Commission did implicitly find the annual charges unreasonable sans reasons for the finding. J.A. 330, 374.

The Order of the Commission shall be modified as to the interest, as we have indicated. Otherwise it is affirmed.

It is so ordered.

TAMM, Circuit Judge (concurring in part, dissenting in part):

I concur in petition No. 21,767 of the Tribes.

With respect to petition No. 21,904, I concur in Judge Fahy's analysis of all the issues (including retroactivity) except those discussed hereinafter from which I respectfully dissent.

## I.

Section 10(e) of the Federal Power Act [1] provides that rentals fixed at the beginning of the license term may be "readjusted" at the end of twenty years. The Commission's view of this provision, approved by the majority, is that the entire analysis of annual charges may be made *de novo*. I cannot agree.

"Readjustment" is not a synonym for "fix anew." The term contemplates adjustment of an annual charge once reasonable, but now found unreasonable. It requires a finding that the former charge is unreasonable,[2] a statement of reasons for the finding and a modification guided by those reasons to accommodate the changed circumstances. *See* California Oregon Power Co. v. FPC, 99 U.S.App.D.C. 263, 239 F.2d 426 (1956). This is the only plausible interpretation of the statute. When a company has entered into a fifty year contract with substantial investment of capital, it does not, and should not, expect the slate to be wiped clean.

The legislative history of the Act clearly rejects the Protean approach adopted by the Commission. The purpose of the Federal Water Power Act [3] was to provide a "method by which the water [power] of the country. . .

3. Federal Water Power Act of 1920, ch. 285, 41 Stat. 1063.

[could] be developed by public or private agencies under conditions which [would] give the necessary *security to the capital invested* and at the same time protect . . . [the] public interest." (Emphasis supplied.) H.R.Rep. No. 61, 66th Cong., 1st Sess. 5 (1919). The Federal Water Power Act was passed to replace the ineffective General Dam Acts[4] which "provide[d] for and authorize[d] conditions upon which the [license] may be granted that render the terms of the investment so uncertain and . . . so defeasible that those having capital cannot safely and will not make investments under them." S.Rep. No. 179, 65th Cong., 2nd Sess. 3 (1917). The majority's acceptance of *de novo* readjustment flies in the face of Congress' attempt to create investment security. Contractual evanescence without regard to precedent or practice discourages investment which in turn harms the public whom the Commission is charged with protecting.

The evil of readjusting annual charges *de novo* is pointedly illustrated by the Commission's treatment of the valuation problem. Although the parties expressly rejected the "profitability" method in their negotiations, (J.A. 183–4) the Commission nonetheless resurrected it.[5] I respectfully suggest[6] that a matter as fundamental as profit sharing should not be imposed retrospectively on the Company absent clear guidance from Congress.[7]

This court has once before significantly altered the original contract between the parties in Montana Power Co. v. FPC, 144 U.S.App.D.C. 263, 445 F.2d 739 (1970) (*en banc*). While I am bound by that decision, I note with dismay that this court has again taken its cutting shears to the contract. This court would do well to recall that we are dealing here with a contract, not thistledown or a transient cloud spun on gossamer. Contracts should provide constancy, not ephemerality. The past should be prologue, not postscript. By ignoring historical antecedents the Commission seriously impinges upon the traditional respect the law has accorded contracts. I would require consideration of the circumstances, commitments and arrangements that were a part of the original agreement as well as a statement of reasons for a finding of unreasonableness which would then serve as a guide for the readjusted charges.

## II.

I also take exception to, and dissent from, the percentage of value assigned to the tribal lands.

In arriving at the tribal share the Commission considered three sources of power in the Kerr Project—natural stream flow, Flathead reservoir and

4. Act of June 21, 1906, ch. 3508, 34 Stat. 386; Act of June 23, 1910, ch. 360, 36 Stat. 593.

5. The Examiner rejected the profitability method because *inter alia* the parties themselves had rejected it. J.A. 330, 334. The Commission, however, disagreed with the Examiner's finding, and instead relied upon the word "profitable" in a clause of the original contract referring to "the most profitable purpose for which [the land is] suitable, including power development," for the conclusion that "a form of profit sharing was indeed contemplated." J.A. 366–367. It is folly to contend that the phrase is intended to do anything but protect against an argument that the annual charges should be determined according to the value of the land for such purposes as farming.

6. Although I disapprove of the use of the profitability method, the error does not appear critical since according to the Commission the next most reasonable net benefits approach would have produced approximately the same value for the Kerr Project. J.A. 367.

7. The net benefit method, approved by this court impliedly in the Third Unit case and by the Commission explicitly on several past occasions was cast aside by the Commission without adequate explanation. It is an elementary tenet of administrative law that an agency must either conform to its own precedents or adequately explain its departure from them. See, e. g., C.B.S. v. FCC, 147 U.S. App.D.C. 175, 454 F.2d 1018 (1971).

Hungry Horse releases. The land underlying the first is wholly owned by the Tribes. The second is equally divided between the Tribes and the Company. The third is owned by neither the Tribes nor the Company.

The Commission determined that the total power generation of the Kerr Project was 1194 Megawatt months (MW). Of this total 161 MW were assigned to the natural stream flow, 376 MW to the Flathead reservoir and 657 MW to Hungry Horse.

The Commission then proceeded to arrive at the sharing formula of 42.13% in two steps. First, the Commission divided the units of production on the basis of 50% for development and 50% for ownership. Then, the Commission again divided the ownership shares so that the water power generated refracted the land interests.[8] The initial split is not in controversy. The latter is however.

Taking the three sources of power and the total generation seriatim, the Commission calculated the tribal share as follows. The Flathead reservoir, which was assigned 376 MW, was divided in the first step on a 50/50 basis resulting in a tribal ownership share of 188 MW. This ownership share was again divided by half since the Tribes owned 50% of the reservoir land, to arrive at a total of 94.0 MW. The stream flow, which was assigned 161 MW, was divided in the first step by half resulting in a tribal share of 80.5 MW. Since the Tribes owned all the land underlying the stream flow, they were assigned all of the 80.5 MW in step two. Hungry Horse which was assigned 657 MW was also divided in the initial step by a half thereby creating a tribal share of 328.5 MW. However, in the second step the Commission suddenly departed from its formula by assigning to the Tribes all of the 328.5 MW despite the fact that neither the Tribes nor the Company owned the land from which the Hungry Horse releases originated.[9] It is this calculation from which I must dissent.[10] I concur in the Commission's observation that the value of a "parcel of realty depends not only on its intrinsic worth, but also upon its location relative to other realty." J.A. 373. However, the Hungry Horse releases flow not only over the tribal lands, but also over that of the Company. Furthermore, the reservoir, partially owned by the Company, makes possible the full use of Hungry Horse and it is the Company's system as a whole which through the Pacific Northwest Coordination Agreement makes possible the realization of much of the value of the project's generation. There was no justification for assigning all of the value of Hungry Horse to the Tribes.

---

8. The Commission adopted the method of witness Stanley E. Sporseen which is explained at J.A. 20–21, 26.

9. Hungry Horse, upstream from Kerr, is a development owned by the government which substantially increases the power generation capacity of Kerr.

10. Graphically, the Commission's 42.13% tribal share is derived as follows:

FACTORS:

| | |
|---|---|
| Natural Stream Flow (100% tribal land) | 161 MW |
| Flathead Lake Reservoir (50% tribal land) | 376 MW |
| Hungry Horse (0% tribal land) | 657 MW |
| | 1194 |

FPC TREATMENT

| | Development/ Ownership Split (50-50) | Water Flow/ Land Refraction Split | Total |
|---|---|---|---|
| Natural Stream Flow | (.50 x 161) = 80.5 | (1.0 x 80.5) = | 80.5 |
| Flathead Lake Reservoir | (.50 x 376) = 188 | (.50 x 188) = | 94.0 |
| Hungry Horse | (.50 x 657) = 328.5 | (1.0 x 328.5) = | 328.5 |
| | | | 503.0 |

$$\frac{503}{1194} = 42.13\%$$

Cognizant of the heavy burden petitioner must bear in seeking to reverse a Federal Power Commission decision, and of the importance of the end result, Montana Power Co. v. FPC, 112 U.S. App.D.C. 7, 298 F.2d 335 (1962), I am nonetheless forced to conclude that the Commission's action is unreasonable and not supported by substantial evidence. *Cf.* Mississippi River Fuel Corp. v. FPC, 82 U.S.App.D.C. 208, 163 F.2d 433 (1947). Although my analysis may seem laborious, it is necessary, for it illustrates that a small miscalculation can create substantially different results. For example, if the Company were assigned half the value of Hungry Horse in the second step,[11] the tribal share would have been reduced to 28% with an annual charge of approximately $631,000 as opposed to the $950,000 the Commission granted.[12]

While I wholeheartedly agree that the Tribes are entitled to an increase in the annual charge, that increase should be fair and reasonable. We must never lose sight of the fundamental truth that the ultimate burden of increased annual charges must be borne not by the Company, but the consumer.

LEVENTHAL, Circuit Judge (concurring in part, dissenting in part).

While I concur in most of Judge Fahy's opinion for the court, I conclude that the adjustment in rentals wrought by the Commission's order may properly be effective as of the date of its notice of hearing, but I do not think a basis has been laid for making it retroactive to the expiration of the 20-year term.

My reasoning begins with the observation that this is a lease, with provision for an independent determination of rentals if the parties cannot agree. To me, this calls for the premise that the rentals should be known. Since the lease does not specifically provide for retro-activity of adjustment, there is merit in the approach that the lessee should know what the adjustment in rental is going to be so that he can decide whether he will occupy the premises. This is theoretical, to be sure, since obviously Montana Power will not quit the premises, but it provides a starting point. And I think it is a different starting point from the familiar situation where the power company is the applicant, for a specified power rate increase put into effect, possibly after a suspension period, subject to recapture.

Even so, retroactivity is permissible for good reason. The FPC gave a reason (JA 365)—that retroactivity is necessary to avoid a premium on litigating delay. However, retroactivity to the date of notice of hearing (1965) also avoids that result.

I see no reason for additional retroactivity to 1959, on the basis of implication, except for an increase to "reflect *known changes*"—calculated by Mr. Seymour to result in $270,000 (see JA 363). Any additional retroactivity to 1959 means that the Company is exposed both to the possibility of a new rental-determining method, which in and of itself I think is unobjectionable, and to its retroactive application, which I think raises problems at least so far as any theory of implication and intent of the parties is involved.

The FPC also said (JA 357) the Company could have avoided injury by maintaining a reserve account. The Company's application for rehearing says (JA 398–399), there was no justification for setting up a contingent reserve prior to the filing of the testimony in October 1965, and that in a rate proceeding neither the Montana Commission nor the FPC would have allowed such a contingent reserve, since the contingency could not be readily calculated. I'm inclined to think the Company has the best

---

11. The Company owned approximately half the land in the Kerr Project.

12. On the assumption that the damsite is more valuable than the other land in the project, if the Commission assigned the Company ¾ of the value of Hungry Horse in the second step, the tribal share would be approximately 35% with an annual charge of approximately $786,000.

of this argument. If it is true that the Company could not have used a contingency reserve in a rate case—and I think it likely—it does seem to me to present at least a general basis for assuming no retroactivity—unless the FPC makes a showing as to why retroactivity prior to the date of the notice of hearing is fair.

The Examiner says (JA 321) that the Company in fact earned enough to absorb the increase in annual rental. But it is for the Montana Commission to say what revenue is appropriate, considering this expense. I don't think the rental for this site should be increased because of what the state commission allows on other properties.

Reverting to the FPC's judgment of full retroactivity for its $950,000, I am also troubled by a legal assumption of the FPC which said (JA 357) that the Act "contemplates that any readjustment ultimately determined becomes effective upon the date which marks the completion of the first twenty years after the project is available for service." This outlines in effect a legal requirement of retroactivity. I think this is an incorrect legal assumption.

The FPC's legal assumption of retroactivity, set out above, is strangely at odds with its conclusion (JA 361)— "that a prescribed charge will continue as the lawful charge under Section 10(e) until demonstrated to be inappropriate." This was said to make clear the FPC would not make a new adjustment effective May 20, 1969, as § 10(e) permits. But the language is evocative of the familiar doctrine that a rate continues until it is set aside as unreasonable. I think that is the "common law" or "common lore" of the regulatory approach that should be followed unless a basis is set forth for reaching a contrary result.

In saying that no basis has been put forward for full retroactivity for 1959–65, I am aware that there was litigation during this period over the third unit. The FPC did not refer to this as a reason

for Montana Power's liability for retroactive adjustment, and I think wisely so. Certainly Montana Power is not responsible for the delay between September 18, 1959, when the FPC fixed an added $50,000 rental, and January 30, 1961, when the FPC raised this to $63,375, due to the objections of the Secretary of Interior and a reopened proceeding. The one year's delay before this court affirmed on January 25, 1962,[1] was not only modest in duration, but provided the only opportunity for court consideration of prickly points. The Commission waited until 1965, to begin a hearing on overall rental adjustment. Perhaps this was due to a conclusion like that reached in Opinion No. 529, Oct. 4, 1967, when it stated that no readjustment would be made as of May 20, 1969, unless a showing were first made that the charge was inadequate (JA 361).

Perhaps this was due to its own needs, for allocating staff to energy projects it considered of higher priority. But this was a tribunal not selected by the Company but imposed upon it. In the absence of a showing that the Company is somehow implicated in the Commission's delay in noticing the docket for hearing, I do not think the Company should be under an obligation to pay an increase in rental for that period except as to known changes.

\* \* \*

While I concur in the affirmance of the FPC's allocation as to the Hungry Horse releases of water, I would like to add to what is in Judge Fahy's opinion. First, any discussion of Hungry Horse must be taken in the context of the Company's real claim before the FPC—that Hungry Horse should be excluded entirely. The FPC rejected that, and we think this is sound. The issue is as to the value of the land, and its place utility in terms of the river, in the light of current conditions as to the river.

The secondary question is, assuming account is taken for the increase in production at the Kerr Hydro-Electric

---

1. Montana Power Co. v. FPC, 112 U.S.App.D.C. 7, 298 F.2d 335 (1962).

Development from the releases of the upstream Hungry Horse waters, how shall this be allocated as between the Kerr basic plant and the Kerr storage reservoir. The need for allocation rises from the fact that at the basic plant the Tribes have a 50% interest, reflecting their ownership of the land, with the Company getting 50% credit for capital invested. At the Kerr reservoir storage, where the Tribes own only ½ the land, the Tribes' percentage is only 25%.

The FPC apparently followed the approach of Mr. Sporseen, witness for the Tribes, who testified that he had followed the method of the Columbia River Coordinating Committee.

His allocation approach began with the energy quantities for Kerr basic plant without storage (161 MW months), and Kerr reservoir storage (251 MW months). In apportioning the 657 MW months for Hungry Horse release, he began with a credit to Kerr reservoir storage of 125 MW months bringing Kerr reservoir storage up from 251 to 376 MW months (1.5 x 251).

The remainder, and bulk, of energy from Hungry Horse waters (532 MW months) was credited to Kerr basic plant. Mr. Sporseen's analysis, simplified, is as follows (JA 12): A plant can be built without any reservoir, using the natural stream flow. If this basic plant gets the use of a reservoir, it makes payment for the assist to its production. We also make a calculation of the assist given to the production of power at the plant from the water released upstream.

I don't think the reservoir is entitled to a credit merely because the new waters are "flowing through" the reservoir. Let me illustrate: Suppose a power plant is given a boost in production when a dam (A) is constructed 20 miles up river. Suppose later a new dam (B) is constructed 30 miles up river. Would dam A be entitled to credit for all the releases from dam B because they pass dam A on the way down to the usage point? I think not.

A final point, concerning a problem that occurs to me as a result of recent litigation on another waterway, see Alabama Power Company v. FPC, 146 U.S.App.D.C. 255, 450 F.2d 716 (1971). My thought is that neither party to the lease should be able to claim that the use of the Kerr storage should be reduced because there is now available a more efficient means of assisting power production in the form of the Hungry Horse waters. However I don't believe this to be a problem in the record before us, as Mr. Sporseen's use of data of "critical period of energy" (JA 11) presumably assumes full use of the Kerr reservoir in addition to the contribution of the Hungry Horse water.